No. 23-1638

# In the United States Court of Appeals for the Fourth Circuit

---

CURTIS LEVAR WELLS JR.,

*Plaintiff-Appellant*,

v.

JAVIER FUENTES et al.,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No.: 1:22-00140
The Honorable Michael Nachmanoff

---

BRIEF OF APPELLANT

Matthew Crist
Direct: 571-551-6859
Email: mcrist@macpllc.net
MATTHEW A. CRIST, PLLC
10432 Balls Ford Rd., Suite 300
Manassas, VA 20109
***Co-counsel for Appellant Wells***

Robert E. Barnes
Direct: 317-510-6211
Email: robertbarnes@barneslawllp.com
BARNES LAW LLP
700 S. Flower Street Suite 1000
Los Angeles, CA 90017
***Co-counsel for Appellant Wells***

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1638 _____    Caption: Wells v. Fuentes, et al., _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Curtis Levar Wells, Jr. _____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                            ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                            ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Matthew Crist                    Date:    June 13, 2023

Counsel for: Appellant

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 7

STATEMENT OF THE ISSUES ........................................................... 8

STATEMENT OF THE CASE ............................................................ 12

SUMMARY OF THE ARGUMENT .................................................... 17

STANDARD OF REVIEW ................................................................. 19

ARGUMENT ...................................................................................... 20

    I.   THE DISTRICT COURT ERRED IN BARRING ALL OF
        APPELLANT'S CLAIMS ON THE GROUNDS OF QUALIFIED
        IMMUNITY.................................................................................. 22

        A. Qualified Immunity Standard. ............................................... 22

        B. The District Court Erroneously Found Qualified Immunity Defeated
           Wells' Claims Across the Board. ............................................ 26

    II.  WELLS' CLAIMS AGAINST ARMSTRONG DO NOT RAISE A NEW
        *BIVENS* CONTEXT ................................................................... 43

    III. FEDERAL TORT CLAIMS ACT. .............................................. 47

        A. FTCA Subject Matter Jurisdiction. ....................................... 48

        B. Application of 28 U.S.C. § 2679, the Westfall Act, to Armstrong's
           Conduct. ................................................................................. 53

    IV.   Second Amendment Injury. ..................................................... 55

CONCLUSION ................................................................................... 57

REQUEST FOR ORAL ARGUMENT ................................................ 57

RULE 32 CERTIFICATE OF COMPLIANCE .................................... 58

CERTIFICATE OF SERVICE ............................................................ 58

## TABLE OF AUTHORITIES

**Cases**

*Arebaugh v. Dalton,* 730 F.2d 970 (4th Cir. 1984) ...................................................23

*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)........................................................24

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ...........................................................20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ...........................................20

*Berryman v. Moore*, 619 F. Supp. 853, 856 (E.D. Va. 1985) .................................41

*Blakey v. U.S.S. Iowa*, 991 F.2d 148 (4th Cir. 1993) ..............................................49

*Chappell v. Wallace*, 462 U.S. 296, (1983)..............................................................43

*Cioca v. Rumsfeld*, 720 F.3d 505 (4th Cir. 2013)...............................................43, 45

*Colorado v. Bertine*, 479 U.S. 367 (1987)...............................................................36

*Cromartie v. Billings*, 298 Va. 284 (2020)...................................................10, 31, 35

*Cummings v. Dep't of the Navy*, 350 U.S. App. D.C. 68, 279 F.3d 1051, 1053

    (2002) ..................................................................................................................48

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..............................................56

*Doe v. United States*, 381 F. Supp. 3d 573, 617 (M.D.N.C. 2019).........................45

*Dunn v. Commonwealth*, 222 Va. 704 (1981)...........................................................41

*Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) ...................................56

*Gomez v. Toledo*, 446 U.S. 635 (1980) ....................................................................22

*Gutierrez de Martinez v. DEA*, 111 F.3d 1148, 1151-52 (4th Cir. 1997) ..............54

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ............................................................22

*Hartsfield v. Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995)....................................26

*Heap v. Carter*, 112 F. Supp. 3d 402, 429 (E.D. Va. 2015)..................................44

*Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) .............................................24

*Hicks v. Ferreyra*, 64 F.4th 156 (4th Cir. 2023).....................................................26

*Kimbro v. Velten*, 308 U.S. App. D.C. 134, 30 F.3d 1501 (D.C. Cir 1994)...........53

*Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012)........................................46

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..............................................56

*Meeker v. Edmundson,* 415 F.3d 317, 323 (4th Cir. 2005) ...................................24

*Meyers v. Baltimore County, Md.*, 713 F.3d 723, 731 (4th Cir. 2013) ..................24

*Mynatt v. United States*, 45 F.4th 889, 898 (6th Cir. 2022) .............................51, 52

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2135 (2022) ...............56

*Nazario v. Gutierrez*, Civil Action No. 2:21CV169 (RCY), 2022 U.S. Dist. LEXIS
    142044, at *16 (E.D. Va. Aug. 9, 2022) ............................................................34

*O'Rourke v. Hayes* ..................................................................................................25

*Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004) ......................................20

*Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015) ......34

*Saucier v. Katz,* 533 U.S. 194 (2001).................................................................23, 24

*South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) .........................................35

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 476 (2d Cir. 2006)...............51

*Tripp v. Exec. Office of the President*, 200 F.R.D. 140, 147 (D.D.C. 2001) ..........53

*United States v. Brown*, 787 F. 2d 929 (4th Cir. 1986)......................................36

*United States v. Stanley*, 483 U.S. 669 (1987) ...................................................43, 46

*Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) .....................19

*Wingate v. Fulford*, 987 F.3d 299, 310-311 (4th Cir. 2021) ...................................23

**Statutes**

28 U.S.C. § 1331 ...................................................................................................7

28 U.S.C. § 1346 ..................................................................................7, 47, 48, 50

28 U.S.C. § 1367 ...................................................................................................7

28 U.S.C. § 2671 .................................................................................................17

28 U.S.C. § 2674 .................................................................................................18

28 U.S.C. § 2680 .................................................................................................50

42 U.S.C. § 1983 ...................................................................................7, 17, 22

Virginia Code § 19.2-59 ......................................................................................10

Virginia Code § 46.2-104 ....................................................................................13

Virginia Code § 46.2-612 ....................................................................................13

Virginia Code §19.2-59 ......................................................................................17

**Rules**

Fed. R. App. P. 34(a)(1) ......................................................................................57

Fed. R. Civ. P. 12(b)(6)..................................................................................passim

Federal Rule of Appellate Procedure 4(a)(1)(A) ...................................................7

Federal Rules of Civil Procedure 12(b)(1) ...........................................................10

**Constitutional Provisions**

Fourth Amendment ........................................................................passim

Second Amendment ........................................................................passim

# INTRODUCTION

***"handwritten list of chemical compounds that have potential to make the human body bulletproof or even invincible."***

The June 2, 2023, Memorandum Opinion, JA464, effectively reduced the test for qualified immunity and applied incorrect evidentiary standards in favor of Fed. R. Civ. P. 12(b)(6) movants and against a civil rights plaintiff. Qualified immunity's reach should not protect officers who, for any or no reason, seize an individual, outside of his jurisdiction, particularly when the officer admitted he operated on nothing more than a mere feeling that something might be wrong. If the district court's June 2, 2023, order is not reversed, the Fourth Amendment will continue its contracting trend.

During a stop that the district court found to be both under the "community caretaker" doctrine **and** a valid criminal investigation of Wells, Appellee Armstrong abandoned his post at Arlington Cemetery, exited the Fort Myer gate, and pulled his vehicle behind Wells' vehicle, seizing him. Later, Armstrong lied under oath about how long he seized Wells, and Appellee Fuentes' testimony confirmed such lie. Despite Armstrong being a civilian-employed military police officer charged with securing Arlington Cemetery, Armstrong took it upon himself to harass Wells for no reason; after seizing Wells on a feeling, Armstrong, for the first time, noticed that Wells' temporary tag on his vehicle was expired and

1

Armstrong made a report to the Arlington County Police Department ("ACPD") which resulted in at least five ACPD Officers being dispatched.

In an incredible and illogical assertion, Armstrong later claimed he thought Wells was suffering a medical emergency – at no time did Armstrong call for medical personnel during the several minute drive it took for him to leave his post inside the barrier of Arlington Cemetery, through Fort Myer, to approach Wells' vehicle and to block it into its parking space. Without a single contemporaneous mention of any suspected medical emergency, Armstrong contacted the ACPD and made a report of a suspicious person, Wells.

Despite these circumstances, Wells remained jovial and considerate to the officers on February 9, 2020; a model for the civilian side of a civilian-LEO interaction.

During the subsequent investigation based upon the foregoing, the ACPD officers documented that Appellant Wells was in possession of a "***handwritten list of chemical compounds that have potential to make the human body bulletproof or even invincible***." Wells had no such list. No such list exists. No such list can possibly exist. What they did find was a note related to a vitamin supplement made by the company Bulletproof; they also make coffee and other supplements.

No person acting reasonably could believe Wells was in possession of such a list. The statement by the officers that Wells had such a list of chemicals is a

2

demonstration of the facial irrationality and unreasonableness that infected every aspect of the numerous civil rights violations that Wells suffered on and after February 9, 2020; those civil rights violations grew in repugnancy because Wells' property was taken by the ACPD Officers to unlawfully rummage through and, on unreasonable and baseless grounds, Wells was incarcerated on February 18, 2020.

Because of the unlawful searches and seizures on February 9, 2020, the warrants that issued thereafter absent any probable cause, and on knowingly false grounds, the search and seizure of Wells' property, the seizure of Wells' person on February 18, 2020, and incarceration through September 9, 2020, and associated deprivation of his rights and tortious harm, Wells brought suit under 42 U.S.C. 1983, and other claims, for damages.

The order entered June 2, 2023, granting the Defendants' Motions to Dismiss found, *inter alia*, that the officers' conduct was reasonable and therefore entitled to the overbroad protections of qualified immunity. The Court erred in finding that the officers' conduct was reasonable because, as a threshold matter, the reliance upon the facially unreasonable statement that the officers found Wells in possession of a list of chemicals that could make him invincible cannot, under any interpretation, no matter how strained, be reasonable.

Additionally:

• Wells did not consent to the searches and seizures on February 9, 2020.

- Appellee Wanek was in possession of the fact that the subject Rifle Plate was purchased for $471.39 in 2009 by the U.S. military and Wanek falsely testified that such market value in 2020 was in excess of the $500.00 limit to convert Wanek's baseless wish that Wells stole it into a felony charge.

- Appellee Shepherd admitted in his testimony given on March 16, 2020, that he was operating on bare assumption and speculation that Wells could have possibly had access to the Rifle Plate when it was owned by the U.S. military, thus substantially causing the malicious prosecution of Wells.

- Appellee Armstrong, a white man, admitted in his testimony given on August 17, 2020, that he operated on nothing more than a "feeling" that Wells, a black man, had done something wrong.

- The district court erred in holding that Armstrong was operating under a "community caretaker" exception to the 4th Amendment.

- The district court erred when it resolved factual contradictions between the officers as to whether Armstrong blocked Wells' car, as Appellee Fuentes stated in his testimony that when he arrived, Armstrong's vehicle was still blocking Wells' vehicle.

- The Court erred when it construed Armstrong's conduct under both the "community caretaker" doctrine and also held that the ACPD Officers on

February 9, 2020, were justified in relying on the detention and investigation that Armstrong had initiated; a logical contradiction.

Resolving factual disputes in the light most favorable to the moving parties, the district court applied the wrong standard to grant the Motions under Fed. R. Civ. P. 12(b)(6) and (1) and dismissed Wells' Second Amended Complaint with prejudice.

The instant Appeal is testing where the line should be drawn on qualified immunity. When officers admit they are operating upon bare assumption and speculation, what is left for the Fourth Amendment to protect? When property is taken under the gossamer veil that it is for "safekeeping," for the benefit of the property owner, but the next day it is unlawfully rummaged through by a detective, what does it mean for the Fourth Amendment to prohibit unreasonable searches and seizures? Wells was not contacted on February 10, 2020, did not consent, and Wanek documented his fruitless, pursuit of ***something*** within that mess of personal property to be stolen.

Wanek documented, in effect, that he had no ***reasonable*** suspicion that any property was stolen, and Appellee Shepherd provided to Wanek, and later admitted, bare assumption and speculation that there might have been a chance that both Wells and the Rifle Plate were in the same place at the same time. Such

admissions by Shepherd and Wanek belie the district court's finding of reasonableness or probable cause.

All underlying criminal charges were dismissed against Wells after an exhaustive and total invasion of every aspect of his life, the destruction of his credit rating, and his incarceration from February 18, 2020, through September 9, 2020. Drugs were found by Appellee Barnickle in Wells' second vehicle in the facially unreasonable and unjustifiable search of Wells' vehicle parked legally in a public parking lot on February 18, 2020 – and Wells maintains he had never possessed nor seen them. Ultimately, the evidence of such drugs was suppressed because of the Fourth Amendment violations.

Finally, Wells lawfully possessed two firearms, both registered to him. Wells clearly articulated his desire to open carry his firearms home with him, and the police, on February 9, 2020, refused to let him do so. The district court erred in failing to fully construe and rule on the Second Amendment claim. When Wells requested to carry his firearms, the officers made it clear he was not permitted to do so – it has been clearly established since 1789 that Wells had the right to open carry his firearms on February 9, 2020, and the officers violated the Second Amendment and prohibited him from carrying them. He did not consent to their seizure.

In the face of the complete absence of any reason to do anything other than to put Wells' property in his trunk and tow Wells' vehicle to his home, as Wells asked them to do, and in the absence of consent, absence of reasonable suspicion, evidence of clear violations of the Second and Fourth Amendments to the United States Constitution, the district court, in ruling on Fed. R. Civ. P. 12(b)(6) and (1) motions resolved factual disputes in the moving parties' favor and erred in its June 2, 2023, Order.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action asserted violations of the Second Amendment and Fourth Amendment to the United States Constitution, violations of 42 U.S.C. § 1983, jurisdiction over the claims against the United States pursuant to 28 U.S.C. §§ 1346 and 2674, and jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The district court entered its final order dismissing Wells' case on June 2, 2023.

Under Federal Rule of Appellate Procedure 4(a)(1)(A), Plaintiff-Appellant timely filed his Notice of Appeal on June 9, 2023, within 30 days after final judgment was entered. This Court has jurisdiction to consider this appeal from the district court's final order under 28 U.S.C. §§ 1291 and 1294.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in dismissing on qualified immunity grounds at the pleadings stage, all of Appellant's claims against all Appellees across the board, by making conclusions of fact that were disputed if not directly contradicted by Appellant's pleadings, and thereby essentially shifting the burden to Appellant of disproving the finding that qualified immunity barred his claims.

2.  Whether the district court erred in applying qualified immunity by holding that the plaintiff failed to plead a constitutional violation due to lack of or contested evidence at the Fed. R. Civ. P. 12(b)(6) stage.

3.  Whether the district court erred in applying the standard of not being able to discredit testimony and therefore concluding disputed factual assertions in the favor of a moving party on a Fed. R. Civ. P. 12(b)(6).

4.  Whether the district court erred in finding the Fourth Amendment was not violated when personal property was searched and seized in the absence of consent, absence of probable cause, absence of reasonable suspicion, and absence of any Fourth Amendment exception.

5.  Whether the district court erred in finding that an officer's stop can be justified both under the Community Caretaker exception and that the stop was a valid investigation of suspected criminal activity.

6.      Whether the district court erred in finding that officers who continue the unlawful detention initiated by another officer, absent any emergency or urgency, can continue the facially unreasonable stop, seizure, detention, arrest, or search.

7.      Whether the district court erred in its application of the Inventory-Search Exception to the Fourth Amendment when the officers failed to follow standard departmental policies or standardized criteria, did not provide a vehicle impound form or inventory of items seized to the property owner, present and not arrested, on scene, when the search was not performed in good faith, and the vehicle owner did not consent.

8.      Whether the district court correctly concluded what conduct implies consent.

9.      Whether the district court erred in finding that officers who substantially and materially participated and cooperated in a prosecution absent any reasonable basis or probable cause are not liable under the Virginia common law of malicious prosecution.

10.      Whether the district court erred in finding that officers who knowingly falsify evidence and withhold evidence from the Commonwealth's Attorney's office and in doing so cause a prosecution absent any reasonable basis or probable cause are not liable under the Virginia common law of malicious prosecution.

11.    Whether the district court erred in finding that searches and seizures without a warrant did not violate Virginia Code § 19.2-59 and Virginia common law.  *Cromartie v. Billings*, 298 Va. 284 (2020).

12.    Whether the district court erred in concluding disputed factual matter in the favor of the moving parties in considering motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6).

13.    Whether the district court erred in finding no violation of the Second Amendment when a person's firearms are seized and held for an extended period of time even when the owner is not under arrest, withheld consent, and no basis existed that the firearms were evidence of a crime.

14.     Whether the district court erred in denying a motion to strike the United States' certification that a defendant acted within the scope of his duties and substituted the United States as a party-defendant when there was a clear and plausible allegation that the employee acted outside the scope of his employment.

15.    Whether the district court erred in requiring a plaintiff to have a developed evidentiary record to rebut a motion under Fed. R. Civ. P. 12(b)(6).

16.    Whether the district court erred in concluding that a civilian military police officer who leaves his post, his place of duty, leaves his jurisdiction, and thereafter falsely imprisons and cooperates in a malicious prosecution is protected under the Westfall Act, 28 U.S.C. § 2679.

17.     Whether the district court erred in its application of the Federal Tort Claims Act, the discretionary-function exception, and whether the Appellees' conduct constituted "due care."

## STATEMENT OF THE CASE

On February 9, 2020, Wells was sitting in his car legally parked in a parking lot adjacent to Arlington Cemetery after going for a jog. JA10-11. He was not threatening any person, causing a disturbance, making any illegal movements or gestures, or conducting himself if any manner that would give anyone a reasonable belief that he was doing anything other than drinking his strawberry-banana smoothie, in peace. JA10-11.

Appellee Armstrong, a civilian employee of the Department of Defense, was inside Arlington Cemetery and, from inside the cemetery, Armstrong saw Wells sitting in his Ford Mustang talking on the phone. JA88-89.[1] Armstrong left his jurisdiction, drove several minutes from his patrol inside Arlington Cemetery, through the Fort Myer gate, and stopped his cruiser behind Wells' Mustang. JA108. Armstrong described his reason for detaining and investigating Wells by saying: "[y]ou know when your kid does something wrong and you just kind of get the feeling that something is off, you don't know quite what they did yet?" JA17; *see also* JA121.

---

[1] Transcript of Armstrong's Testimony at the Motion to Suppress Hearing, August 17, 2020.

When Appellee Fuentes arrived, Armstrong's vehicle was still blocking

Wells' vehicle from leaving.  JA154, JA90-JA91.[2]  Armstrong testified, falsely,

and falsely claimed in his memorandum to the district court, that his encounter

with Wells was brief and that he immediately removed himself from the situation.

JA96.  According to the audio recording and Fuentes' testimony, Armstrong stayed

on scene, participated in the search and seizure of Wells' property, and can be

heard throughout the audio recording of February 9, 2020.  JA18.  *See also*,

February 9, 2020, Recording.

Ultimately, Fuentes issued two citations for Improper Registration in

violation of Virginia Code § 46.2-612 and Driving Without Driver's License in

Possession in violation of Virginia Code § 46.2-104 on February 9, 2020.  JA67-

68.  Fuentes, Armstrong, and the other ACPD officers on February 9, 2020, took

some, but not all, of Wells' personal property out of his Ford Mustang without

consent.  JA20.  No item of property searched or seized on February 9, 2020, had

any evidentiary value to the citations nor were connected to any articulable

suspicion of criminal activity.  JA19.

---

[2] Transcript of Fuentes' Testimony at the Motion to Suppress Hearing, August 17, 2020.

Armstrong, Fuentes, and Appellees Lugasi, Soules, Kline, and Vanak,[3] conducted the search and seizure of Wells' Mustang, personal property, and firearms on February 9, 2020. JA21-24. Wells' Mustang was not towed to a police impound lot, it was towed to Wells' apartment. JA22. The ACPD Officers did not follow policy by properly filling out and presenting to Wells a vehicle impound form, securing all personal property for safekeeping, and failed to inventory all items in the vehicle to prevent claims of theft or damage.

The form was not given to Wells and was not signed by Wells, and not provided until filed in the district court on November 22, 2022. JA454. Ultimately, the officers did not inventory all items of value, did not produce to Wells a written inventory of what was seized, and can be heard on the audio recording discussing among themselves that they are going to take Wells' property and that Wells was a "fucking bullshitter." February 9, 2020, Recording at 5:15 PM. Wells had no choice in the matter and did not consent.

Even though the impound form was never presented to Wells, the Property Retrieval Process form was provided to Wells. JA69. At no time did Wells consent to the searches and seizures of his personal property on February 9, 2020, or thereafter, and Wells specifically asked to take his property and firearms home

---

[3] Collectively, Fuentes, Lugasi, Soules, Kline, and Vanak are sometimes referred to as "ACPD Officers."

with him.  JA20, JA69; *see also*, February 9, 2020, Recording, 4:39 PM through

4:42 PM.  An unknown person, suspected to be Appellee Wanek, crossed out the

word "safekeeping" on the Property Retrieval Process form and wrote "evidence."

JA69, JA70.

During the searches and seizures on February 9, 2020, one of the officers

promulgated an unreasonable, and fantastical, assertion that Wells was in

possession of "a handwritten list of chemical compounds that have potential to

make the human body bulletproof or even invincible."  JA27-28.  Wells had no

such list; in reality, the police found a banal handwritten note that Appellant made

regarding a health supplement manufactured by a company named "Bulletproof"

and the supplement was for choline.  JA288, JA28, JA29.

After the events of February 9, 2020, Wanek unlawfully rummaged through

the property ostensibly taken for safekeeping; evidence that is expected to be

developed in this case, if permitted to go to discovery, include Wanek's notes and

testimony, that will show a series of events including Wanek attempting, and

failing, to find a piece of property that is stolen.  Wanek ultimately found in the

Rifle Plate[4] an item with an origin that could be obfuscated sufficiently to present

---

[4] The Rifle Plate in question is a hard piece of body armor used by military
personnel; but such equipment is also used for games such as airsoft and in training
for force protection, a profession for which Wells was training.

to a magistrate as stolen.  JA29.  Shepherd falsely testified that the Rifle Plate in question had a value in excess of $500.00.  JA346, However, Shepherd and Wanek knew the truth that the value was $471.38 when the military purchased it in 2009. JA307.[5]  It appears that Wanek and Shephard had this document, the CRR, as early as February 13, 2020, but did not provide this information to the Commonwealth's Attorney until much later, according to an email from the CA to Wells' defense attorney.  JA310.

Shepherd's testimony demonstrated, by reasonable inference, that he was aware of the difference between the purchase price and replacement cost. Shepherd testified as to the process of the United States purchasing the Rifle Plate and distributing them; then, when he was asked about the ***purchase price*** of the Rifle Plate, which he knew was $471.38 in 2009, he testified misleadingly and provided the 2020 ***replacement cost*** of new rifle plates of $590.91.[6]  JA345-JA346.

Shepherd and Wanek falsely testified, or testified in a knowingly misleading manner, regarding their belief that Wells could have possibly stolen the Rifle Plate. Shepherd admitted that he provided bare assumption and speculation to Wanek.

---

[5] The receiving report shows the Rifle Plate was purchased for $471.38 in 2009.
[6] The equivocation requires additional documents and testimony to fully prove. This record, while supported by some FOIA production, is incomplete.  The Central Issuing Facility stated only the contemporaneous replacement cost, but Wanek and Shepherd were in possession of the 2009 Ceredyne Receiving Report ("CRR") indicating the purchase price in 2009 was $471.38.

JA348.  Wells explained that he purchased the plate at an airsoft facility.  JA374.
Such rifle plates are extremely common pieces of equipment one may wear while
exercising and playing airsoft.

At no time did Wanek, Shepherd or any other person have any basis to
believe that Wells could have possibly stolen the Rifle Plate, and discovery will
reveal that Wanek possessed, and withheld, evidence to the contrary from the
Commonwealth, as implied by the Commonwealth's Attorney.  JA305, JA310.

On August 22, 2022, Wells filed his Second Amended Complaint.  JA10.
Wells' claims arise under 42 U.S.C. § 1983 for Second Amendment and Fourth
Amendment violations, common law False Imprisonment and Malicious
Prosecution, violation of Virginia Code § 19.2-59, and for claims under *Bivens*,
403 U.S. 388 (1971), *Monell*, 436 U.S. 658 (1978), and the Federal Tort Claims
Act 28 U.S.C. § 2671, *et seq*.[7]

## SUMMARY OF THE ARGUMENT

Appellant Wells' claim for damages came to the district court because of the
civil rights violations he suffered on and after February 9, 2020.  The officers'
conduct, together with Wanek, Shepherd, and others, through a series of
interrelated transactions and occurrences, resulted in the civil rights harms, false

---

[7] Wells is not pursuing his claim under *Monell* against the County of Arlington,
any claim against Officer Barnickle, or the *Bivens* claim against Shepherd.

imprisonment, and malicious prosecution of Mr. Wells. Wanek and Shepherd's conduct in providing false, misleading, or fabricated information to the Commonwealth's Attorney, and presumably, the magistrate, based upon the false or misleading information received from the February 9, 2020, searches and seizures, and based, in material part, upon Shepherds' own assumption and speculation, resulted in Wells' arrest and incarceration, search and arrest warrants issuing absent probable cause, and the series of civil rights violations thereafter.

The district court erred in applying the wrong standard for qualified immunity to the instant set of facts, erred in resolving disputed factual allegations in favor of the moving party on Fed. R. Civ. P. 12(b)(6), (1) motions, and held that facially unreasonable law enforcement conduct was reasonable or otherwise the district court failed to address plausible allegations, supported by the FOIA-produced evidence, and facially unreasonable conduct.

Furthermore, the district court applied the wrong standard for the claims made against the United States of America under the FTCA for the conduct of its employees, Armstrong and Shepherd. 28 U.S.C. § 2674. The district court erred by holding that Wells failed to overcome the "discretionary-function exception" to FTCA liability. Wells' claims are not against any federal agency and do not contain any request for judicial second guessing of legislative and administrative decisions; notably, the district court stated, inaccurately, "Plaintiff is seeking to

18

hold the United States liable for Shepherd and Armstrong's decisions to assist local law enforcement officers in the search of his vehicle and the investigation of his possession of the rifle plate."

For a yet-unexplained reason, a material document, the Impound Form, unsigned by Wells, was not produced until attached to the ACPD Officers' Reply in Support on November 22, 2022.  JA461.  The district court did not construe the thrust and import of this late-produced document and whether it should contain Wells' signature, should have been presented to Wells on February 9, 2020, and whether an inventory was made or provided to Wells.  JA485.  Nor did the district court confront Wells' allegation of failure to follow standard procedure or policy, insofar as the Fourth Amendment exceptions raised in defense by the ACPD Officers for the February 9, 2020, events.  The district court concluded the officers' conduct was reasonable, that Wells consented to the searches and seizures, and because Wells was unable to provide conclusive proof, his claims should be dismissed.  Such standard is an impractical standard for any plaintiff to overcome in opposing a Fed. R. Civ. P. 12(b)(6) motion, absent extraordinary cooperation by the government.

## STANDARD OF REVIEW

A district court's grant of a Fed. R. Civ. P. 12(b)(6) motion is reviewed *de novo*.  *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015).

Similarly, a dismissal for want of jurisdiction under Fed. R. Civ. P. 12(b)(1) is reviewed *de novo*. *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004). Under both Fed. R. Civ. P. 12(b)(1) and (6), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004).

While a complaint must contain factual allegations sufficient to state its claim of relief that is plausible on its face, a complaint can withstand a motion to dismiss, even if it appears that recovery is very remote and unlikely. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), *see also, Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT

The district court erred as a matter of law in granting qualified immunity to Appellees. Wells' Second Amended Complaint contained well-pleaded allegations that defeat the defense of qualified immunity. Furthermore, the district court applied the wrong standard in resolving disputed factual matter in the movant's favor. For example, without evidence, the district court determined that Wells consented to the searches and seizures on February 9, 2020; at most, the matter is in dispute and should be resolved by a jury.

Qualified immunity comes from a public policy position that officers conducting their duties in a good faith, reasonable way should not be held liable for harms caused by their actions. When a civil rights plaintiff brings on claims against law enforcement officers for searches and seizures, the initial burden is to provide plausible, well-pleaded allegations. When a defendant raises the defense of qualified immunity, the district court should dismiss the case only when the officer is able to satisfy their burden that he or she did not violate a constitutional right, or that the right was not clearly established when the violation occurred.

In this case, the district court shifted from a position that Wells failed to sufficiently plead a constitutional violation, to construing disputed factual matter, and then to qualified immunity operating to bar Wells' causes of action across the board – while construing disputed facts in the officers' favor. In doing so, the district court erroneously shifted the burden of disproving that qualified immunity barred his claims to Wells. The district court further compounded this error by erroneously making conclusions of fact that were disputed if not directly contradicted by Wells pleadings, in dismissing all of Appellant's claims on qualified immunity grounds. These errors must be reversed by this Court.

I.     **THE DISTRICT COURT ERRED IN BARRING ALL OF
       APPELLANT'S CLAIMS ON THE GROUNDS OF QUALIFIED
       IMMUNITY.**

Each individual Appellee argued, and the district court held, that Wells'

action against the officers should be dismissed on qualified immunity grounds.

While the district court discussed other matters, ultimately, all five dismissal

motions made by Appellees were granted and every claim against each individual

officer was dismissed on qualified immunity grounds.

### A. Qualified Immunity Standard.

In 1982, the Supreme Court issued its opinion in *Harlow v. Fitzgerald,* 457

U.S. 800 (1982). *Harlow* is a watershed decision on the elements of qualified

immunity, that clarified and defined the burden of pleading and proving that

affirmative defense as follows: "Qualified or 'good faith' immunity is an

affirmative defense that must be pleaded by a defendant official." *Id.,* 457 U.S. at

813-814, (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)).

Two years before *Harlow,* the Supreme Court decided *Gomez*, where it also

held that a police agent defendant bore the burden of proving the affirmative

defense of qualified immunity in a 42 U.S.C. § 1983 action against him:

> "Since qualified immunity is a defense, the burden of pleading it rests
> with the defendant. See Fed.Rule Civ.Proc. 8(c) (defendant must
> plead any "matter constituting an avoidance or affirmative defense");
> 5 C. Wright & A. Miller, Federal Practice and Procedure § 1271
> (1969). It is for the official to claim that his conduct was justified by
> an objectively reasonable belief that it was lawful. We see no basis for

imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith." *Gomez, supra.,* 446 U.S. at 640-641.

For no less than forty years since the *Harlow* and *Gomez* decisions, this Court has held true to the rule that a defendant claiming qualified immunity bears the burden of proving its elements in order to gain the benefits of dismissal pursuant to that affirmative defense: "The burden of establishing a qualified immunity defense rests on the official asserting the defense." *Wingate v. Fulford*, 987 F.3d 299, 310-311 (4th Cir. 2021); *see also Arebaugh v. Dalton,* 730 F.2d 970 (4th Cir. 1984) ("the burden is on the defendants to establish a good faith defense. citing *Harlow v. Fitzgerald,* 457 U.S. 800, (1982))."

As the district court below itself held, the Supreme Court articulated the two-part test for qualified immunity in *Saucier v. Katz,* 533 U.S. 194 (2001). Specifically, the *Saucier* decision holds that a defendant asserting claims against it are barred by qualified immunity, has the burden of demonstrating one of the two elements of that affirmative defense applies:

> First: Determine whether, '[t]aken in the light most favorable to the party asserting the injury,' the facts alleged by that party 'show the officer's conduct violated a constitutional right.' [citing *Saucier, supra,* 533 U.S. at 201]. Second: If a constitutional violation occurred, ask whether 'it would be clear to an objectively reasonable officer that his conduct violated that right.' [citing *Saucier, supra,* 533 U.S. at 202]. In undertaking that second inquiry, the court 'must ascertain whether a reasonable [official] could have believed [the challenged conduct] to be lawful, in light of clearly established law.

23

JA476-JA477 (citing *Meeker v. Edmundson,* 415 F.3d 317, 323 (4th Cir.

2005) (other citations omitted)).  This Court has consistently followed the standard

set forth by the Supreme Court in *Saucier* and its progeny, in holding that it is the

defendant asserting qualified immunity that has the burden of demonstrating its

elements:

> The [Supreme] Court's holding in *Saucier* requires a two-step
> approach, under which a court first must decide whether the facts
> alleged or shown, taken in the light most favorable to the plaintiff,
> establish that the police officer's actions violated a constitutional right.
> [citing *Saucier, supra,* 533 U.S. at 201]. When a plaintiff has satisfied
> this initial step, a court next must determine whether the right at issue
> was 'clearly established' at the time of the officer's conduct.

*Meyers v. Baltimore County, Md.*, 713 F.3d 723, 731 (4th Cir. 2013); *see also*

*Wingate*, supra, 987 F.3d at 311; and *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.

2011).

Qualified immunity does not protect officers who knowingly violate the law

or are plainly incompetent.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  Nor

does qualified immunity protect an officer who makes unreasonable mistakes.

*Henry, supra,* 652 F.3d at 534-535 ("The relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."

(quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)).

In scrutinizing a defendant's qualified immunity defense, the courts are to

employ an objective analysis, disregarding an individual officer's subjective intent

or beliefs:

> Similarly, our Court has consistently conducted an objective analysis
> of qualified immunity claims and stressed that an officer's subjective
> intent or beliefs play no role.  In *Melgar v. Greene*, we made clear that
> 'an officer's good intentions do not make objectively unreasonable
> acts constitutional.' [citing *Melgar v. Greene*, 593 F.3d 348, 361 (4th
> Cir. 2010)]."

*Henry, supra*, 652 F.3d at 535.  Finally, a defendant is not entitled to qualified

immunity, who merely follows and engages in the conduct of other officers that is

otherwise unconstitutional.  In *O'Rourke v. Hayes*, Defendant Hayes, a law

enforcement officer, appealed the denial of his motion for summary judgment on

qualified immunity grounds.  378 F.3d 1201 (11th Cir. 2004).  In denying Hayes'

qualified immunity defense, the *Hayes* court held as follows:

> Hayes's only remaining defense is that he did not make the initial
> decision to enter the office, but instead merely followed the other
> officers inside, 'defer[ing]' to their judgment.  His defense ultimately
> boils down to 'But everyone else was doing it!' Without inquiring as
> to what Hayes would do if everyone else were jumping off a bridge,
> we recognize that precedent squarely precludes his claim.
> In *Hartsfield,* 50 F.3d at 956, we held that all officers, including those
> following someone else's lead, could be held liable under § 1983 if
> 'they knew or should have known that their conduct might result in a
> violation of the [plaintiff's] Fourth Amendment rights.' This is the
> same test for determining whether any government official is entitled
> to qualified immunity.  Whether or not the police officers
> accompanying Hayes decided to enter O'Rourke's office, their
> unconstitutional behavior did not relieve Hayes of his responsibility to
> decide for himself whether to violate clearly established constitutional

rights by intruding into the office without a warrant or exigent circumstances.

*Hayes, supra*, 378 F.3d at 1210 (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995)).

### B. The District Court Erroneously Found Qualified Immunity Defeated Wells' Claims Across the Board.

1. *The district court erroneously found that qualified immunity barred Appellant's claims against Appellee Armstrong.*

The district court correctly found that Wells' Fourth Amendment protections were implicated during his interactions with Armstrong on February 9, 2020. JA475. Furthermore, the district court found that the requirements of *Bivens* were satisfied by Wells' Second Amended Complaint and that the recent decision in *Hicks II* indicated, on similar facts, that a *Bivens* remedy is available to Wells against Armstrong.[8] Paradoxically, then, in applying the qualified immunity standard the district court held "Plaintiff has failed to establish that his Fourth Amendment rights were violated." JA477.

The district court, in applying the qualified immunity standard, incorrectly utilized the "community caretaker" exception to the Fourth Amendment to support a finding that the claims against Armstrong should be dismissed. Because the qualified immunity standard is an objective test, Armstrong's subjective and

---

[8] *Hicks v. Ferreyra*, 64 F.4th 156 (4th Cir. 2023).

26

unsupported assertions of his observations are irrelevant.  If his conduct was objectively not reasonable under the circumstances, and in violation of the Fourth Amendment, Armstrong must not be afforded the protections of the qualified immunity doctrine.

Armstrong's conduct, as well-pleaded in the Second Amended Complaint, was objectively unreasonable.  The district court mentioned that it cannot discredit sworn testimony at this stage.  JA478.  However, Armstrong's self-serving, and unsupported, testimony should be, at most, given equal weight to Wells' Second Amended Complaint, where the finding of fact is appropriate at this stage.  Then, on a Fed. R. Civ. P. 12(b)(6) motion, where there is a conflict between Wells' allegations and Armstrong's testimony, such facts must be concluded in Wells' favor and, therefore, the Motion should have been denied – such disputes should be left either to a fuller evidentiary record on summary judgment or to a jury to determine.

Primarily, in Paragraphs 35 through 44, and 66, Wells' Second Amended Complaint materially contradicts Armstrong's testimony.  Armstrong falsely claims his interaction was a brief, 1-minute encounter, that he quickly removed himself from the situation, and that he merely made a report.  Not only do Wells' allegations contradict Armstrong's testimony, but Fuentes' testimony **and Armstrong's own testimony** also contradicted Armstrong's Motion to Dismiss.

*Cf.* Armstrong's testimony in JA125 - JA128 to Fuentes' testimony in JA168 - JA170. Notably, Fuentes recalled only a report of a suspicious person, notably absent is any mention of any medical emergency or any observation that would contemporaneously support the community caretaker argument. JA168.

Furthermore, Armstrong's own testimony sets up a facially evident conclusion that he was operating to investigate what he suspected was criminal activity, in contradiction to his later claim to create the community caretaker exception. JA17. Thus, the district court erroneously held that it cannot discount Armstrong's sworn testimony when, at this stage, it was obligated to discount Armstrong's testimony on a 12(b)(6).

Ultimately, however, the district court did utilize Armstrong's subjective assertions and purported community caretaker exception. In doing so, the district court inaccurately construed disputed and incredible factual matter in Armstrong's favor. Notably, the February 9, 2020, recording is devoid of any mention of Armstrong's belief that Wells may have had a medical emergency, the first report from Armstrong to the ACPD indicates a suspicious person, and five officers were dispatched – not one medical technician.

If Armstrong believed there was a medical emergency when he first saw Wells, it is more likely that he would have called for an EMT instead of driving for several minutes out of Arlington Cemetery, through Ft. Myer, out of Ft. Myer's

gate, and behind Wells' vehicle. What is more probable is that Armstrong saw an African American man sitting in a nice car and, as Armstrong said, viewed Wells in a facially unreasonable way: "You know when your kid does something wrong and you just kind of get the feeling that something is off, you don't know quite what they did yet?" JA17.

Should this action proceed into discovery, it will be Wells' testimony that the first thing Armstrong said to him was, "does this car belong to you?" a classic trope that African American men are unfortunately accustomed to hearing from police officers.

Ignoring all of the above facts and associated disputed factual assertions, the district court concluded such factual disputes in the movant's favor, Armstrong's favor, and found the community caretaker exception applied[9] – despite later justifying the ACPD Officers' conduct on the criminal investigation initiated by Armstrong. JA486.

The conduct of Armstrong in his initial contact with Wells was facially unreasonable and there is no evidence of his later-crafted story that he was acting in a community caretaker capacity. Armstrong's testimony demonstrated that his

---

[9] For the community caretaker exception to apply, Armstrong's conduct must have been "unrelated to the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." JA478 (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

first observation of Wells was from such a distance that he could not make out more than an individual was in a car. It was unreasonable to seize Wells based upon such observation, Armstrong had no jurisdiction, and Armstrong's later false-exculpatory testimony further implies he knew he violated Wells' rights.

Armstrong's conduct set in motion the series of events that followed that were reasonably foreseeable when a law enforcement officer initiates a patently unreasonable criminal investigation; Wells' person and property were searched and seized, he was falsely imprisoned, he was arrested, he was prosecuted without probable cause, that is, maliciously prosecuted, and warrants to search and seize his person and property were issued without probable cause, and Wells suffered, largely in solitary confinement, from February 18, 2020 through September 9, 2020, during the height of COVID.

2. *The district court erroneously found that qualified immunity barred Appellant's claims against Appellee Fuentes.*

Fuentes, and the balance of the officers on and after February 9, 2020, cannot justify their Second Amendment, Fourth Amendment, and state tort violations based upon Armstrong's unreasonable investigation. As Fuentes viewed the scene on February 9, 2020, it was reasonable to issue one citation for Wells'

expired temporary tag.[10]  At most, from the objective standard, Fuentes was

obligated to issue the citation and release Wells.  Appellant does not bring any

claim based upon  Fuentes' initial detention of Wells for safety purposes to issue

the expired tag citation, on a temporary basis.  However, Wells was forced to sit on

a curb, cuffed with his arms behind his back, for approximately an hour and,

during that detention, with Wells sitting at a comfortable remove from his firearms,

Fuentes removed Wells' firearms for safety.  JA161.  The firearms could have no

relation to the expired temporary tag, but they were searched and seized anyway.

JA161.  The removal of the firearms for safety can be construed as initially

reasonable; however, the continued seizure and search cannot, and the

constitutional violations thereafter, cannot.  *Cromartie v. Billings*, 298 Va. 284,

298, 837 S.E.2d 247, 254 (2020) ("[t]he Supreme Court of the United States has

held that an officer may not conduct a 'vehicle search incident to a recent

occupant's arrest after the arrestee has been secured and cannot access the interior

of the vehicle.'")

    As Fuentes said, he issued the citations, seized the firearms, and removed

himself from the situation.  JA165-JA166.

_____

[10] Even though no officer witnessed Wells operating his vehicle, Fuentes also
issued Wells a citation for driving without his driver's license in his possession.

31

The conflict between Wells' testimony and Fuentes' testimony regarding Wells' consent must be, at most, a jury issue. The district court, instead, resolved disputed facts in the movant's favor and held the seizures were reasonable. The audio recording on February 9, 2020, clearly demonstrates Wells asking, numerous times, to be permitted to take his firearms or for his property to be locked in the trunk. Specifically, Wells stated, "I can't just like … get an Uber with that?" "Can I, like, buy you dinner? Is there anything I can do to not get towed?" "I would be for leaving everything in the trunk."[11]

Not once does the audio recording show Wells consented; rather, Wells merely ceased arguing with the police – by public policy, the courts should not require a detained citizen to physically fight the police to demonstrate lack of consent with a search or seizure. Despite these factual disputes, or facts that strongly support Wells' position, the district court erred in resolving factual disputes in the movant's favor.

Furthermore, Fuentes unreasonably seized Wells' firearms in violation of the Second Amendment. Even if the Appellees argue that initial handcuffing and segregation of Wells from his firearms were reasonable at the beginning on safety reasons, ultimately, the seizure of the firearms became an unreasonable

---

[11] February 9, 2020, Recording at 4:39 PM, 4:48 PM, 4:48:50 PM.

infringement upon Wells' Second Amendment and Fourth Amendment rights, and the firearms were held until April 16, 2021.  Fuentes even acknowledged that he was aware that Wells had the right to keep and bear his firearms and open carry them.  JA165.

Fuentes' conduct set in motion, and he substantially cooperated in, the series of transactions or occurrences that were reasonably foreseeable when any law enforcement officer initiates or substantially cooperates in a criminal investigation, searches, and seizures; Wells' person and property were searched and seized, he was falsely imprisoned, he was arrested, and warrants to search and seize his person and property were issued without probable cause, and Wells suffered, largely in solitary confinement, from February 18, 2020, through September 7, 2020, during the height of COVID.  Finally, Wells' firearms were unreasonably seized and held until April 16, 2021.  No Appellee has made any assertion, no matter how threadbare, that the firearms had any reasonable connection to any suspected crime, let alone the infraction citation Wells received on February 9, 2020.

> 3. *The district court erroneously found that qualified immunity barred Appellant's claims against the remaining ACPD Appellees.*

Appellees Lugasi, Soules, Kline, and Vanak's conduct on February 9, 2020, is not excused by any exception to the Fourth Amendment, was unreasonable, and Wells did not consent to their searches and seizures.  The district court found that

the ACPD Officers were entitled to continue the criminal investigation started by

Armstrong, despite the fact that the district court also found that Armstrong was

operating under the subjective community caretaker exception to the Fourth

Amendment, and thus was not conducting a criminal investigation.[12]

Even if the ACPD Appellees argue that the initial searches and seizures were

reasonable and justified on safety grounds, the lack of any reasonable suspicion

that any of the personal property searched and seized had any connection to the

citations issued to Wells defeats their arguments. *Rodriguez v. United States*, 575

U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015) ("A seizure for a traffic violation

justifies a police investigation of that violation. '[A] relatively brief encounter,' a

routine traffic stop is 'more analogous to a so-called '*Terry* stop' . . . than to a

formal arrest.") *see also*, *Nazario v. Gutierrez*, Civil Action No. 2:21CV169

(RCY), 2022 U.S. Dist. LEXIS 142044, at *16 (E.D. Va. Aug. 9, 2022) ("A valid

traffic stop becomes unlawful if it is prolonged beyond the time reasonably

required to complete the 'mission' of the stop.")

The ACPD Appellees argued that their searches and seizures were justified

on the so-called inventory search exception, and the district court agreed.

---

[12] For the community caretaker exception to apply, Armstrong's conduct must have been "unrelated to the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." JA478 (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

However, similar to *Cromartie*, the Appellees' search and seizure violated Wells' rights secured by the Fourth Amendment and Va. Code 19.2-59. *Cromartie v. Billings*, 298 Va. 284, 299 (2020) ("The evidence in this case established that while Cromartie was seated behind her vehicle, secured with handcuffs and leg shackles, and in the physical custody of the backup officer, Billings entered Cromartie's car, retrieved her purse from it, and proceeded to search the purse. Neither her vehicle nor her purse could have contained evidence of speeding.")

The ACPD Officers provide a threadbare connection to the inventory search exception, however, they unreasonably concluded, without evidence, that he was a "fucking bullshitter"[13] and failed to comport with their own departmental policies. By default, all searches without a warrant or consent are unreasonable. *See South Dakota v. Opperman*, 428 U.S. 364, 369, 381 (1976). The three valid purposes that give rise to the inventory search exception come from (1) the need to protect the car owner's property within the vehicle while in the police impound lot, (2) to protect against claims of theft or damage against the police by the owner, and (3) to protect police from potential danger, such as bombs in the car. *See South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). Furthermore, the inventory-search exception only applies if it is conducted according to uniform police department policy and in good faith.

---

[13] February 9, 2020, Recording at 5:15 PM.

*United States v. Brown*, 787 F. 2d 929 (4th Cir. 1986), *see also*, *Colorado v. Bertine*, 479 U.S. 367 (1987).

Utilizing no evidentiary record, the district court ignored the factual assertions by Wells and resolved the facts in the light most favorable to the movants and concluded that good faith existed and that it was enough that policy was "generally complied with." JA487. However, the ACPD officers failed to inventory all items of value in the vehicle, lied to Wells about their intentions,[14] and failed to properly prepare, file, and provide a copy of the impound form[15] to Wells, and no inventory was provided to Wells indicating what was seized on February 9, 2020. Notably, the impound form, not provided to Wells until November 22, 2022, does not have Wells' signature on it, and does not list any valuables in view; furthermore, it does not indicate to which location the vehicle was towed.[16] JA461.

The district court recited and observed that, at some point, one of the officers, suspected to be one of the ACPD Officers, initiated the facially

---

[14] When out of earshot of Wells, one officer is heard stating to another they were going to take Wells' property, disregarding Wells' attempts to call a friend to help him. February 9, 2020, Recording at 5:15 PM.

[15] The form can be viewed at JA461. Said form was not provided to Wells on February 9, 2020, and it was not produced in response to a FOIA request; Wells was not aware of it until it was filed with the district court on November 22, 2022.

[16] The evidence will show that Wells rode with the tow truck driver while his car was towed to Wells' home; it was never stored in an impound lot.

unreasonable observation that Wells was in possession of a "handwritten list of chemical compounds that have potential to make the human body bulletproof or even invincible."   JA466.  The district court does not, however, apply the necessary conclusion that such statement, which is intrinsically incredible and unreasonable, demonstrated that the officers were not acting in reasonably or in good faith.  Later officers, operating in reliance upon the ACPD Officers' findings of February 9, 2020, never stopped to question this report.

As outlined in the Second Amended Complaint, the fantastical and unreasonable findings of the officers was merely a reference to a health supplement.  JA28-29.  Similarly, the officers made false reports that Wells was in possession of armor piercing ammunition, had properties mapped out, and had a list of "darkweb" sites, and other incredible, and false, statements, that will come to light upon a full evidentiary record; such unreasonable and false statements support a finding that the officers were not acting reasonably or in good faith on February 9, 2020.

Ultimately, the ACPD Officers' conduct set in motion the series of transactions or occurrences that were reasonably foreseeable when any law enforcement officer initiates a criminal investigation; Wells' person and property were searched and seized, he was falsely imprisoned, he was arrested, and warrants to search and seize his person and property were issued without probable cause,

and Wells suffered, largely in solitary confinement, from February 18, 2020

through September 7, 2020, during the height of COVID.

> 4. *The district court erroneously found that qualified immunity barred Appellant's claims against Appellee Wanek.*

Appellee Wanek made knowingly-false statements in his testimony,

converted property to evidence taken, unlawfully, as property held for

"safekeeping," without warrant, consent, or exception to the Fourth Amendment,

and lied about the value of the Rifle Plate.  The district court correctly held that

evidence otherwise taken lawfully, can be later reviewed without Fourth

Amendment violation.  However, Wells' property was unlawfully taken in

violation of the Fourth Amendment on February 9, 2020, and Wanek knowingly

participated in a continuation of such violations on February 10, 2020, and

thereafter.

Furthermore, Wanek's knowingly false statements as to the value of the

Rifle Plate, seeking and obtaining warrants without probable cause that the Rifle

Plate was stolen, because he knew the Rifle Plate could not have been stolen by

Wells, knowingly cooperating with Shepherd to make up the fantastical possibility,

in contradiction of the evidence in their possession, that Wells could have been in

the same place and time as the Rifle Plate to have stolen it, and continued the use

of the facially unreasonable assertion that Wells was in possession of a

"handwritten list of chemical compounds that have potential to make the human

38

body bulletproof or even invincible," demonstrates that Wanek's conduct falls well below the standard necessary to meet the burden of the qualified immunity defense.

Qualified immunity does not protect officers who knowingly violate the law or make unreasonable mistakes.

Wanek's testimony to the magistrate to secure the arrest warrant is, at present, unknown. From the FOIA production, there appears to be no notes or affidavit memorializing what Wanek stated that secured the arrest warrant; however, one can make the reasonable inference, based upon his later testimony and conduct, he lied to the magistrate. Notably, Wanek testified that he spoke with Wells' former barracks roommate, Dotson, who described his strained relationship with Wells but also affirmatively stated he was not missing a Rifle Plate. Ultimately, the Commonwealth called Dotson as a witness in the Preliminary Hearing on March 16, 2020, against Wells for allegedly stealing Dotson's Rifle Plate. Assistant Commonwealth's Attorney Wright spoke with Dotson prior to calling him as a witness and he stated he was not missing anything.[17] JA305.

While Wanek was, unfortunately, permitted to lie to Wells, a criminal suspect, at the time, it appears a logical inference from the series of events that

---

[17] Dotson exercised his Fifth Amendment privilege and did not testify.

Wanek also lied to the Commonwealth or to the magistrate, or both. Wells was charged at the time only with the theft of the Rifle Plate; however, Wanek testified, in his own words, that Dotson told Wanek he was not missing a rifle plate. JA403. If Wanek had told the Commonwealth or magistrate that Dotson had informed him on February 12, 2020, that he was not missing his Rifle Plate, there appears no logical reason why Dotson was called as a witness to prove that Wells had stolen Dotson's Rifle Plate.

As early as February 10, 2020, Wanek began investigating the Rifle Plate in question; sometime early in his investigation, he began working with Appellee Shepherd and, together, they initiated a slight of hand. Shepherd, a detective for the department of defense, had a report of thefts of rifle plates. At no time was there any evidence showing that the Rifle Plate in question, which is serialized, was within the set of plates suspected to be stolen. Wanek was aware that Wells' Rifle Plate was purchased for $471.38 in 2009. JA307. Wanek and Shepherd were also aware that the Rifle Plate was in California in 2014, and they had no other information about where it went. JA310. This information was not given to the Commonwealth until late May 2020. JA310. It is a reasonable logical inference that this information was also withheld, by Wanek, from the magistrate.

Wells was in the military from 2017 to 2019. Thus, evidence in Wanek's possession showed it was practically impossible, or at best, an unreasonable

conclusion, that Wells could have been in contact with the Rifle Plate, that cost

$471.38 in 2009, while both Wells and the Rifle Plate were in service.  Wanek and

Shepherd then formulated a plan to provide false testimony that Wells had been

made a suspect in the thefts that Shepherd was, allegedly, investigating.[18]  Such

false testimony augmented the case and materially participated in the malicious

prosecution against Wells.

The cost of $590.00 was used by Wanek and Shepherd because it was the

replacement cost of new rifle plates as reported on the Central Issue Facility's

website in 2020; that is, if a soldier lost his rifle plate, he would have to pay $590

in 2020 to replace it.  JA459.  The reasonable officer operating in Wanek's

position would have known that since 1985, the appropriate manner of valuing

property for the purposes of theft charges is not the replacement or original value.

> [In *Dunn v. Commonwealth*] the Virginia Supreme Court reversed a
> conviction of grand larceny where the only evidence of the value of
> the stolen item, a ten-year-old television set, was its original cost.  The
> Court stated 'without a showing of the effect of age and wear and tear
> on the value of an item such as a typewriter, the jury might be misled
> to believe that original price equals current value.'

*Berryman v. Moore*, 619 F. Supp. 853, 856 (E.D. Va. 1985) (quoting *Dunn v.*

*Commonwealth*, 222 Va. 704 (1981)).  Omitting the 2009 original purchase cost

---

[18] There had been no document admitted into evidence showing any such report or
investigation actually occurred.

and reasonable effects of time on the value of the Rifle Plate, and also providing the 2020 $590 replacement cost, was knowingly misleading to the Commonwealth, to the Court, and, likely, to the magistrate and was a clearly established state of the law in 2020 when Wanek violated Wells' civil rights.

Additionally, the images taken by the officers on February 9, 2020, demonstrate it was unserviceable and, therefore, worthless.  JA31-JA33.  It is exceptionally common for people to wear surplus or discarded military equipment for paintball, airsoft, and exercise – the officers found airsoft masks in Wells' vehicle on February 9, 2020, and spoke to him about the fact that he played airsoft. JA384.  Such information verified the obvious explanation – however, the officers continued with their unreasonable and knowingly false allegations.

Despite the foregoing, and substantially more to be developed in discovery, the district court applied the wrong standard and construed the facts in the light most favorable to Wanek to grant his Fed. R. Civ. P. 12(b)(6) and dismiss Wells' claims.  Wanek's conduct set in motion the series of events that followed that were reasonably foreseeable when a law enforcement officer initiates a patently unreasonable criminal investigation; Wells' person and property were searched and seized, he was falsely imprisoned, he was arrested, he was prosecuted without probable cause, that is, maliciously prosecuted, and warrants to search and seize his person and property were issued without probable cause, and Wells suffered,

largely in solitary confinement, from February 18, 2020 through September 9, 2020, during the height of COVID.

## II.    WELLS' CLAIMS AGAINST ARMSTRONG DO NOT RAISE A NEW *BIVENS* CONTEXT.

Despite the fact that the district court held that it does not need to conclusively find whether Wells' claims present a "new context" under *Bivens* common law, the district court incorrectly construed material case law and implied that it "may nonetheless present a 'new context' of *Bivens* liability."  JA476 n.5. Notably, the district court held, and the United States argued, that Wells' claims seek an extension of *Bivens* liability to the military context or incident to military service.  Particularly, the district court erred in adopting the line of cases relating to military personnel seeking redress as a plaintiff.  In this case, Wells has never raised any request for relief incident to military service.  The fact that Wells was, at one point, an enlisted soldier is irrelevant to what happened to him on February 9, 2020 and thereafter.[19]  Such confusion of the issue has resulted in an application of the *Cioca-Chappell-Stanley* line[20] of cases that have no bearing on Wells' claims against Armstrong for Armstrong's conduct that is facially similar to the *Hicks II* opinion and *Bivens* itself; that is, a line-level, federal law enforcement officer

---

[19] Wells served in the United States Army from 2017 to 2019.
[20] *Cioca v. Rumsfeld*, 720 F.3d 505 (4th Cir. 2013); *Chappell v. Wallace*, 462 U.S. 296, (1983); *United States v. Stanley*, 483 U.S. 669 (1987).

operating under color of law and violating the Fourth Amendment rights of a civilian in the search and seizure context. Armstrong is not being sued because of any injury caused to Wells incident to Wells' service in the military or because of Armstrong's military service.

Most notably, Armstrong, while a servicemember at one point, was, on February 9, 2020, acting in his role as a civilian police officer employed by the Department of Defense. JA86. Furthermore, Wells receiving a monetary award because of the harms he suffered being falsely imprisoned by Armstrong and subject to the unreasonable searches and seizures on February 9, 2020, as well as the harms suffered thereafter, will not cause the judiciary to interfere with or pass judgments on military decisions or "intrusion into military decision making that *Stanley* feared." *Heap v. Carter*, 112 F. Supp. 3d 402, 429 (E.D. Va. 2015).

Wells' claims against Armstrong are not claims that implicate military law, military personnel matters, national security issues, administration of uniquely defense-orientated institutions, how the military conducts itself or disciplines military officers, nor is there any "military setting" at issue in this matter. Armstrong was a civilian employee of the Department of Defense who violated the Fourth Amendment rights of a civilian, Wells, under the color of law, and was, therefore, acting in an analogous role to the United States Park Police officers as construed in *Hicks II* and the Federal Bureau of Narcotics officers in *Bivens*, itself.

44

The district court cited *Doe v. United States* and relied upon its counseling of hesitation to extend *Bivens* into the DoD context.  381 F. Supp 3d 473 613 (M.D.N.C. 2019).  However, *Doe's* holding in the *Bivens* context does not primarily focus on the hesitation to extend *Bivens* to a military defendant, but because the Plaintiffs were suing the defendant under a Fifth Amendment claim and because:

> [T]he Complaint references an abundance of DoD regulations, and this case might require this court to analyze military policies and practices, 'a province almost always reserved for review, enforcement and adjudication through the Legislative or Executive branches.' Meron, 2018 U.S. Dist. LEXIS 127474, 2018 WL 3619538, at *11. Finally, litigation involving the workings of the DoD might require court intrusion into not just a co-equal branch of government, but one responsible for our national security and sensitive information.

*Doe v. United States*, 381 F. Supp. 3d 573, 617 (M.D.N.C. 2019).  There is no analogous concern in Wells' Second Amended Complaint against Armstrong.

The district court's reliance upon *Cioca* is similarly misplaced.  In their lawsuit against former secretaries of defense, Robert Gates and Donald Rumsfeld, twenty-five women and three men brought suit alleging harms caused by Secretary Gates and Secretary Rumsfeld's conduct of creating a culture of sexual predation in the military.  *Cioca v. Rumsfeld*, 720 F.3d 505, 507 (4th Cir. 2013).  The *Cioca* action bears no resemblance Wells' claims against Armstrong.

In *Lebron v. Rumsfeld*, an active member of al Qaeda brought an action against Secretary Rumsfeld, and other high-level policymakers, for his detention. 670 F.3d 540, 544 (4th Cir. 2012). The Fourth Circuit's primary resolution of the issue starts, "[s]pecial factors do counsel judicial hesitation in implying causes of action for enemy combatants held in military detention. *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012). The *Labron* matter does not bear any resemblance to Wells' claims of a civilian being injured by the conduct of a line-level, civilian, federal employee, police officer, identical to the circumstances of *Bivens*.

To the extent the district court implies that *United States v. Stanley* would similarly support the dismissal of Wells' action against Armstrong, it, too, is misplaced. 483 U.S. 669 (1987). *Stanley* arises from harm caused to Stanley when he was an enlisted servicemember and was secretly administered doses of LSD. *Id* at 671. However, the Supreme Court held "that no *Bivens* remedy is available for injuries that 'arise out of or are in the course of activity incident to service.'" *United States v. Stanley*, 483 U.S. 669, 684 (1987). Neither the Federal Government's pleadings, nor the district court's Opinion, give any explanation as to how Wells' claims against Armstrong fit the Supreme Court's description of the "incident to service" test.

Neither Wells nor Armstrong were military personnel on February 9, 2020. A monetary award against Armstrong for his Fourth Amendment violations would

not result in a judicial invasion of the military, and no pleading or fact alleged to exist by any Appellee bears any similarity to any of the cases relied upon by the district court.  Wells' claims against Armstrong are not an extension of *Bivens* to a new context.  Assuming, without admitting, that this case does require an extension, there exists no factor that counsels hesitation.

### III.    FEDERAL TORT CLAIMS ACT.

Count IX of Wells' Second Amended Complaint does not seek to hold the United States liable for Shepherd and Armstrong's as a standalone claim of *respondeat superior* or vicarious liability.  Wells' Second Amended Complaint contains well-pleaded allegations against the United States for the harm caused by Shepherd and Armstrong and his claims are premised upon 28 U.S.C. § 1346(b)(1).  Count IX reflects the very same concept that was utilized by the district court, "[a]ll FTCA liability is *respondeat superior* liability."  JA479.  If Wells' Second Amended Complaint had one count under the FTCA and a separate count pursuant to vicarious liability principles, the district court's conclusion would be accurate to dismiss the second claim; the Second Amended Complaint does not so plead.  As held, the district court erred.

### A. FTCA Subject Matter Jurisdiction.

Counts III[21] and IV,[22] bring state law claims against Armstrong and Shepherd and Count IX seeks compensation from the United States for the harms caused by Armstrong and Shepherd's conduct.  28 U.S.C. § 1346(b)(1) expressly permits Wells' claim for damages from the United States.  The district court erred both in applying the case law raising the United States' immunity for military matters and also the discretionary function doctrine.[23]

> 1. *Wells' claims do not implicate military investigations or harm to military personnel, and do not invade military decision making or disciplinary policy.*

In part, the district court raised the issue of Wells' harms being caused by military conduct – without any pleading or evidence that any conduct complained of implicates the military or harm to military personnel, the district court erred and concluded, at least in part, that Wells' claims should be dismissed because of the

---

[21] False imprisonment against Armstrong.

[22] Malicious prosecution against Shepherd.

[23] The United States, in its Motion to Dismiss and associated memoranda, also raised the *Feres* doctrine; while the district court does not directly rely upon the *Feres* doctrine, it is, similarly, inapplicable because Wells was not in the military during any of the events at issue in this case and Wells' claims do not raise any claim for injuries that arise out of or are incident to service.  "In *Feres*, the United States Supreme Court held that 'the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Cummings v. Dep't of the Navy*, 350 U.S. App. D.C. 68, 279 F.3d 1051, 1053 (2002).

caution against the judiciary intruding into military investigations. JA482.[24]

*Blakey*, however, holds that the United States should be immune to actions

involving tortious injuries **to** military personnel. *Blakey v. U.S.S. Iowa*, 991 F.2d

148, 150 (4th Cir. 1993). It does not bear on the question of whether the United

States should be immune in circumstances analogous to Wells, a civilian,

complaining of tortious harm caused by federal employees, Armstrong and

Shepherd.

        2. *Discretionary-function exception: Armstrong and Shepherd's conduct.*

        Inaccurately, the district court held that Wells has brought his claim against

Armstrong and Shepherd for their decisions to assist local law enforcement in

search of Wells' vehicle on February 9, 2020, and later investigation. JA481. The

claims against Armstrong stem from his conduct in leaving his post within

Arlington Cemetery, to drive through Fort Myer, and to stop his cruiser behind

Wells – conduct which the district court admits, "…the Fourth Amendment

protections were implicated by [Armstrong's] interactions with Plaintiff" and

_____

[24] The district court cites to *Blakey v. U.S.S. Iowa*, 991 F.2d 148 (4th Cir. 1993).
"The decedent was a Petty Officer in the United States Navy assigned to active
duty on the U.S.S. Iowa." *Blakey v. U.S.S. Iowa*, 991 F.2d 148, 150 (4th Cir.
1993). The holding of *Blakey* is not relevant to Wells' claims against the United
States; Wells was a civilian at the time of the events complained and Armstrong
was not on a military base nor acting pursuant to military orders when he caused
tortious harm to Wells.

"Plaintiff has sufficiently alleged that he was not free to leave, triggering his

Fourth Amendment protections." JA477.

Similarly, Shepherd's conduct complained of is not a mere discretionary

choice to investigate Wells. Shepherd admitted the information he provided to

Wanek was based upon bare speculation and assumption. JA353-JA354.

Shepherd's conduct fell well below the standard of reason and competence that

demonstrates a want of probable cause, thus satisfying the malice element of

malicious prosecution. A reasonable inference from the limited evidentiary record

indicates that Shepherd made up, out of whole cloth, the possibility that Wells

could have been near the Rifle Plate while in the military to have stolen it.

In addition to triggering his Fourth Amendment protections, Armstrong also,

necessarily, falsely imprisoned Wells. Armstrong's conduct placed Wells in the

reasonable apprehension that he was not free to leave, and the testimony of Fuentes

indicates Wells would not have been able to move his car out of its parking space.

Armstrong's conduct is a paradigmatic example of false imprisonment, and the

United States has waived its immunity for the negligent or wrongful acts or

omissions of federal employees. 28 U.S.C. § 1346(b)(1).

Furthermore, the discretionary-function exception does not apply to such

tortious harm caused by Armstrong. The discretionary-function exception is

premised upon the federal employee "exercising due care." 28 U.S.C. § 2680. If

not meaningless, "due care" must rise above harassing Wells for sitting in his car. Armstrong's facially unreasonable conduct and later-crafted explanations, absent any supporting evidence and in contradiction to the testimony of other officers, cannot be enshrined as "due care."

Finally, while, in some instances, police conduct similar to Armstrong's conduct might fall within the discretionary-function exception, "there is a line between conduct of the kind that the discretionary function exception was designed to shield, and the sorts of run-of-the-mill torts, which, while tangentially related to some government program, are not sufficiently grounded in regulatory policy so as to be shielded from liability." *Mynatt v. United States*, 45 F.4th 889, 898 (6th Cir. 2022). For instance,

> The negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction. *See Coulthurst*, 214 F.3d at 109 (holding that a negligent guard theory would not fall under the discretionary function exception because '[s]uch negligent acts neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy').

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 476 (2d Cir. 2006). In both *Mynatt* and *Triestman*, the courts recognized that while the first prong of the discretionary-function exception may require exercise of discretion, when there is misconduct on the part of the officers, such conduct is both not sufficiently connected to regulatory policy and is not the type of conduct the discretionary

51

function exception was designed to shield. *See Mynatt v. United States*, 45 F.4th 889, 898 (6th Cir. 2022).

Armstrong's conduct is both disconnected form regulatory policy and is not the type of conduct the discretionary-function exception was designed by Congress to shield. Similar to *Mynatt*, the limited evidentiary record indicates that Armstrong provided false-exculpatory testimony that evinces a guilty mind for his conduct on February 9, 2020. Armstrong's conduct implies that he knew he falsely imprisoned Wells by later crafting, with no contemporaneous evidence, that he was operating under a community caretaker role. Such conduct by Armstrong was not related to policy and is not the conduct that Congress desired to shield by creating discretionary-function exception.

Shepherd's conduct similarly reflects the *Mynatt* paradigm. He provided such strained information to Wanek based upon bare assumption and speculation that it was inevitable that Wells would be subjected to a malicious prosecution. In the ordinary and uninterrupted flow of events after Shepherd gave his knowingly-false information to Wanek, false testimony and information relating to the provenance and value of the Rifle Plate, and in, at least one, email to the Commonwealth's Attorney, Shepherd's malicious prosecution is disconnected from regulatory policy and is not the type of conduct Congress desired to shield by creating the discretionary-function exception.

## B. Application of 28 U.S.C. § 2679, the Westfall Act, to Armstrong's Conduct.

Armstrong admits in his own testimony that he left his post, Arlington Cemetery, and parked his vehicle behind Wells, thereby, at a minimum, falsely imprisoning Wells. Wells further claimed that Armstrong, while continuing to act outside of his jurisdiction, under the color of law, and without authority, searched and seized Wells' person and property. The district court, however, in footnote 3, accepted without sufficient scrutiny the certification by United States Attorney Aber that Armstrong acted within the scope of his employment. JA470. The substitution and certification do not, however, substitute the United States by operation of law. *Tripp v. Exec. Office of the President*, 200 F.R.D. 140, 147 (D.D.C. 2001). Furthermore, the Attorney General's determination, in this case, by United States Attorney Aber, is not conclusive. *Id* (citing *Kimbro v. Velten*, 308 U.S. App. D.C. 134, 30 F.3d 1501 (D.C. Cir 1994)).

The assertion that Armstrong acted within the scope of his employment is facially inaccurate and not conclusive. While the district court held that Wells provided no evidence that Armstrong acted outside the scope of his employment, the Second Amended Complaint alleges, and Armstrong's testimony supports, the reasonable conclusion that Armstrong acted outside the scope of his employment by leaving his post of Arlington Cemetery. Wells has not had an opportunity to provide the evidentiary record that the district court appeared to expect.

53

In this factually complex matter, Wells has brought claims against Armstrong both in his official capacity acting within the scope of his employment and individually.  Second Amended Complaint ¶¶ 10, 19.  JA12 – JA13.  For example, a reasonable jury could find Armstrong acted outside the scope of his employment by leaving his post on Arlington Cemetery and detaining Wells.  The district court erred, in footnote 3, by holding Wells to the standard of having a full evidentiary record, pre-discovery.  JA470.  At the stage in which the district court has dismissed this action, the correct standard is that a plaintiff pleads plausible facts – Wells should not be held to the standard to have "specific evidence"[25] similar to the *Gutierrez* matter cited by the district court because it was simply in a different evidentiary posture:

> We remanded the case to the district court. When the district court reopened the case, the United States Attorney for the Eastern District of Virginia refiled the certification that Lamagno was acting within the scope of his employment. Later, Appellants requested limited discovery and an evidentiary hearing. The United States submitted a memorandum in opposition, requesting an in camera judicial determination of the challenge to the scope-of-employment certification. Thereafter, the district court ordered the parties to submit briefs, affidavits, and documentary evidence on the issue of Lamagno's scope of employment.

*Gutierrez de Martinez v. DEA*, 111 F.3d 1148, 1151-52 (4th Cir. 1997).

---

[25] JA470 n. 3.

### IV.    Second Amendment Injury.

The district court noted its skepticism as to the viability of Wells' claim that his Second Amendment rights were violated on February 9th, and thereafter, by the conduct of the Appellees.  JA488-JA489.  The district court relies, exclusively, upon Wells' consent[26] to the firearms being placed in safekeeping.  Wells expressly indicated his lack of consent, numerous times, and, while handcuffed for an hour, sitting on a low concrete curb, nearing dusk, on February 9, 2020, with mucus hanging from his nose, he finally relented and stopped trying to reason with the officers.  Noting his lack of consent, Wells said, "I can't just like … get an Uber with that?" "Can I, like, buy you dinner?  Is there anything I can do to not get towed?" "I would be for leaving everything in the trunk."[27]  From a public policy perspective, the district court should not obligate a civilian to physically attack a police officer to demonstrate lack of consent.

Furthermore, the district court does not analyze the Second Amendment implications of Fuentes prohibiting Wells from open carrying his firearms.  JA165.

---

[26] Wells has maintained and continues to maintain he did not consent to said searches and seizures; at most, this is a jury question.  Neither the Defendant-Appellees nor the district court has pointed to any document, testimony, or moment in the February 9, 2020, recording where Wells indicated his consent.  At most, the district court has found consent when Wells merely **gave up** – that must not be the current definition of "consent."

[27] February 9, 2020, Recording at 4:39 PM, 4:48 PM, 4:48:50 PM.

While Fuentes ultimately stated his self-serving testimony that he believes Wells consented, Wells' testimony will be that he did not consent, and the well-pleaded allegation state as much.  JA51-JA52.  At most, the district court should have found that this was a disputed matter to be decided either after a full evidentiary investigation, upon summary judgment, or a jury issue.  The district court, notably, does not indicate what document or part of the audio recording proves Wells' consent sufficient to rise to the level to dismiss the case in this posture.

In the recent *Bruen* decision, the Supreme Court resoundingly held that the Second Amendment presumptively guarantees an individual's right to bear arms in public.  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2135 (2022).  Stepping further back, in *Heller*[28] and *McDonald*,[29] the Supreme Court held that the right of an individual to keep and bear arms was a clearly established constitutional right.  The Third Circuit in *Frein*, construed the context of the Second Amendment violation that exists when law enforcement seizes and keeps a firearm, even if the initial seizure were lawful.  *Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022).

Thus, in the absence of any evidence demonstrating Wells' consent, the district court erred holding that Wells is not entitled to compensation for his

---

[28] *District of Columbia v. Heller*, 554 U.S. 570 (2008).
[29] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

Second Amendment injury caused when he was prohibited by a law enforcement officer from open carrying his firearms, and also that his firearms were unlawfully seized and held from February 9, 2020, to April 16, 2021.  Abandonment of a fundamental constitutional right should not be imputed from disputed facts and a complete lack of evidence.  There should be a higher standard for the district court to conclude consent, particularly when reviewing the evidence on a Fed. R. Civ. P. 12(b)(6) motion in the light most favorable to Wells.

## CONCLUSION

For the foregoing reasons, and in the interests of substantial justice, the district court's June 2, 2023, Order should be reversed, and Wells' case remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a)(1), Appellant Mr. Wells respectfully requests oral argument in this matter.

Respectfully submitted,
*/s/ Matthew A. Crist*
Matthew A. Crist, Esq.
Matthew A. Crist, PLLC
10432 Balls Ford Rd., Suite 300
Manassas, VA 20109
571-551-6859
mcrist@macpllc.net
***Co-counsel for Appellant***

57

**RULE 32 CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,931 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements to Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced Times New Roman font size 14.

Dated: October 30, 2023

/s/ Matthew A. Crist
Matthew Crist
*Co-counsel for Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, October 30, 2023, the foregoing document was served on all parties through the CM/ECF system.

/s/ Matthew A. Crist
Matthew Crist
*Co-counsel for Appellant*