## CASE NO. 23-1638

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

CURTIS LEVAR WELLS, JR.,

*Plaintiff-Appellant,*

v.

JAVIER FUENTES, *et al.,*

*Defendants-Appellees,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

## RESPONSE BRIEF OF APPELLEES

David P. Corrigan (VSB No. 26341)
Leslie A. Winneberger (VSB No. 45040)
Blaire H. O'Brien (VSB No. 83961)
HARMAN CLAYTOR CORRIGAN WELLMAN
Post Office Box 70280
Richmond, VA 23255
804-747-5200
dcorrigan@hccw.com
lwinneberger@ hccw.com
bobrien@hccw.com

*Counsel for Appellees - Javier Fuentes, Scott Wanek,
Lauren Lugasi, Kimberly Soules, Austin Kline and John Vanak*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1638__        Caption: __Wells v. Fuentes, et al.,__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Javier Fuentes__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?              ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?              ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Leslie A. Winneberger                 Date:    6/23/2023

Counsel for: Javier Fuentes

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1638      Caption: Wells v. Fuentes, et al.,

Pursuant to FRAP 26.1 and Local Rule 26.1,

Scott Wanek
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?   ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?          ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Leslie A. Winneberger          Date:     6/23/2023

Counsel for: Scott Wanek

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-1638__      Caption: __Wells v. Fuentes, et al.,__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Lauren Lugasi__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                   ☐YES ☑NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Leslie A. Winneberger                    Date:        6/23/2023

Counsel for: Lauren Lugasi

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  23-1638          Caption:  Wells v. Fuentes, et al.,

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kimberly Soules
(name of party/amicus)


who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.  Does party/amicus have any parent corporations?                    ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Leslie A. Winneberger                Date:        6/23/2023

Counsel for: Kimberly Soules

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1638__      Caption: __Wells v. Fuentes, et al.,__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Austin Kline__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.      Does party/amicus have any parent corporations?    ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Leslie A. Winneberger          Date:     6/23/2023

Counsel for: Austin Kline

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1638__        Caption: __Wells v. Fuentes, et al.,__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__John Vanak__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Leslie A. Winneberger          Date:        6/23/2023

Counsel for: John Vanak

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................iii

JURISDICTIONAL STATEMENT........................................................ 1

STATEMENT OF ISSUES................................................................. 2

STATEMENT OF THE CASE .............................................................. 2

    A.    The ACPD Officers respond to a call for assistance ................................. 2

    B.    The ACPD Officers had to tow the car from the scene ............................ 3

    C.    ACPD Officers conducted an inventory search........................................ 5

    D.    ACPD Officers talked to Appellant about his firearms............................ 6

    E.    Appellant was convicted of the traffic offenses ....................................... 7

    F.    Detective Wanek investigated ................................................................. 8

SUMMARY OF ARGUMENT.......................................................... 10

ARGUMENT ................................................................................. 13

    I.    The District Court did not err in concluding that Appellant bore the burden of pleading sufficient facts to state a constitutional claim for purposes of the qualified immunity analysis ........................................... 13

    II.    The District Court did not err in concluding that the Second Amended Complaint did not state a cause of action against Officer Fuentes ................................................................................... 16

        A. Officer Fuentes did not violate the Fourth Amendment by continuing Armstrong's stop ...................................................... 16

        B. Appellant's remaining allegations do not state a claim against Officer Fuentes ................................................................ 19

i

III.  The District Court did not err in concluding that the Second Amended Complaint did not state a cause of action against the ACPD Officers ........................................................................... 22

A.  The ACPD Officers reasonably believed they were conducting an inventory search of Appellant's car ...................... 23

B.  The ACPD Officers did not violate the Fourth Amendment in taking possession of the "List." ................................................ 26

C.  The ACPD Officers did not violate the Second Amendment ....... 27

IV.  The District Court did not err in concluding that the Second Amended Complaint did not state a cause of action against Detective Wanek ................................................................. 30

A.  Detective Wanek reasonably relied on information he received from Shepherd .................................................... 31

B.  The general district court found probable cause to certify Appellant's criminal charge following a contested preliminary hearing .................................................... 33

V.  The District Court did not err in dismissing the state-law claims ........... 35

CONCLUSION ....................................................................... 37

CERTIFICATE OF COMPLIANCE ...................................... 38

# TABLE OF AUTHORITIES

## Cases

*Arebaugh v. Dalton*,
  600 F. Supp. 1345 (E.D. Va. 1985) ...................................................... 21

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ...................................................................... 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................... 21

*Baylor v. Commonwealth*,
  55 Va. App. 82, 683 S.E.2d 843 (2009) .............................................. 34

*Cades v. H & R Block, Inc.*,
  43 F.3d 869 (4th Cir. 1994) ........................................................... 36

*Colorado v. Bertine*,
  479 U.S. 367 (1987) ................................................................ 23, 24

*Cromartie v. Billings*,
  298 Va. 284, 837 S.E.2d 247 (2020) .................................................. 23

*Dill v. Kroger Limited Partnership I*,
  300 Va. 99, 860 S.E.2d 372 (2021) ................................................... 36

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................................... 29

*Doe v. Rector & Visitors of George Mason Univ.*,
  132 F. Supp. 3d 712 (E.D. Va. 2015) ................................................. 14

*Evans v. Chalmers*,
  703 F.3d 636 (4th Cir. 2012) ................................................ 32, 35, 37

*Goines v. Valley Cmty. Servs. Bd.*,
  822 F.3d 159 (4th Cir. 2016) ........................................................ 16, 28

*Guerrero v. Deane*,
  750 F. Supp. 2d 631 (E.D. Va. 2010) ................................................ 17

*Hall v. Virginia*,
  385 F.3d 421 (4th Cir. 2004) .......................................................... 15

*Hunsberger v. Wood*,
   570 F.3d 546 (4th Cir. 2009) ................................................................ 13

*Illinois v. Lafayette*,
   462 U.S. 640 (1983) ............................................................................ 23

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ......................................................... 12, 29

*Lewis v. Kei*,
   281 Va. 715, 708 S.E.2d 884 (2011) .................................................. 36

*Mom's, Inc. v. Willman*,
   109 F. App'x 629 (4th Cir. 2004) ....................................................... 33

*Muehler v. Mena*,
   544 U.S. 93 (2005) .............................................................................. 19

*New York State Rifle & Pistol Association Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ............................................................... 12-13, 29

*Nunez v. Commonwealth*,
   No. 8-21-4, 2022 WL 2203050 (Va. Ct. App. June 21, 2022) .............. 3

*O'Rourke v. Hayes*,
   378 F.3d 1201 (11th Cir. 2004) .......................................................... 18

*Octave v. Wade*,
   No. 3:16-cv-00338-JAG, 2017 WL 465467 (E.D. Va. Feb. 3, 2017) ................ 21

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ............................................................................ 13

*Rizzo v. Goode*,
   423 U.S. 362 (1976) ............................................................................ 21

*Shaver v. Commonwealth*,
   30 Va. App. 789, 520 S.E.2d 393 (1999) ........................................... 35

*Stanton v. Elliott*,
   25 F.4th 227 (4th Cir. 2022) .............................................................. 14

*Sutterfield v. City of Milwaukee*,
   751 F.3d 542 (7th Cir. 2014) ......................................................... 29, 30

*Trulock v. Freeh*,
   275 F.3d 391 (4th Cir. 2001) .............................................................. 21

iv

*United States v. Avagyan*,
    164 F. Supp. 3d 864 (E.D. Va. 2016) ................................................. 17

*United States v. Banks*,
    482 F.3d 733 (4th Cir. 2007) .......................................................... 24

*United States v. Davis*,
    690 F.3d 226 (4th Cir. 2012) .......................................................... 31

*United States v. Fort*,
    313 F. App'x 665 (4th Cir. 2009) .................................................... 25

*United States v. Hensley*,
    469 U.S. 221 (1985) ........................................................... 17, 18, 32

*United States v. White*,
    707 F. App'x 766 (4th Cir. 2017) .................................................... 24

*Unus v. Kane*,
    565 F.3d 103 (4th Cir. 2009) .......................................................... 20

*Walker v. Prince George's County, Md.*,
    575 F.3d 426 (4th Cir. 2009) .......................................................... 15

*Walters v. Wolf*,
    660 F.3d 307 (8th Cir. 2011) .......................................................... 30

*Ware v. James City County*,
    652 F. Supp. 2d 693 (E.D. Va. 2009) .............................................. 17

*White v. Pauly*,
    580 U.S. 73 (2017) ....................................................................... 14

*Whiteley v. Warden*,
    401 U.S. 560 (1971) ..................................................................... 17

*Wilson v. Kittoe*,
    337 F.3d 392 (4th Cir. 2003) .......................................................... 14

*Wright v. Collins*,
    766 F.2d 841 (4th Cir. 1985) .................................................... 21, 26

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ..................................................................... 14

## Statutes

28 U.S.C. § 1291 ........................................................................... 1

28 U.S.C. § 1331 ........................................................................... 1

28 U.S.C. § 1343 ........................................................................... 1

28 U.S.C. § 1367 ........................................................................... 1

Arlington County, Va. Code § 14.2-2 ........................................... 4, 18, 23

Va. Code Ann. § 15.2-1728 ........................................................... 3

Va. Code Ann. § 18.2-95 ............................................................... 34

Va. Code Ann. § 18.2-96 ............................................................... 34

Va. Code Ann. § 18.2-108 ............................................................. 35

Va. Code Ann. § 19.2-72 ............................................................... 33

Va. Code Ann. § 19.2-183 ............................................................. 33

Va. Code Ann. § 19.2-191 ............................................................. 33

Va. Code Ann. § 46.2-104 ......................................................... 3, 36

Va. Code Ann. § 46.2-612 ................................................. 3, 4, 19, 23, 36

## Other Authorities

Fed. R. App. P. 28 ................................................................. 35-36

Fed. R. Civ. P. 12 ....................................................................... 15

Uber Firearms Prohibition Policy ............................................... 28

# JURISDICTIONAL STATEMENT

The District Court entered an Order on May 31, 2023, granting five dismissal motions: (1) the motion to dismiss filed by the Arlington County Police Department ("ACPD") officer defendants, Javier Fuentes ("Officer Fuentes"), Austin Kline, Lauren Lugasi, Kimberly Soules ("Officer Soules"),  and John Vanak[1] (collectively, "ACPD Officers"); (2) motion to dismiss filed by Ashley Barnickle ("Officer Barnickle");[2] (3) the motion to dismiss filed by Scott Wanek ("Detective Wanek");[3] (4) the motion to dismiss filed by Michael Armstrong, Keith Shepherd, and the United States (collectively, "federal defendants"); and (5) the motion to dismiss filed by Arlington County ("County"). The District Court granted the ACPD Officers' and Detective Wanek's motions based on qualified immunity and for failure to state claims for false imprisonment or malicious prosecution. The District Court granted Officer Barnickle's motion based on qualified immunity. Appellant noticed his Appeal on June 9, 2023.

The District Court had jurisdiction over the federal constitutional claims asserted by Appellant pursuant to 28 U.S.C. §§ 1331 and 1343. The District Court also had supplemental jurisdiction over Appellant's Virginia state law claims pursuant to 28 U.S.C. § 1367(a).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] Officers Kline, Lugasi, Soules, and Vanak will be referred to collectively as the "ACPD Officers."

[2] Appellees note that Officer Barnickle has since been dismissed as a Defendant/Appellee.  Dkt. No. 37.

[3] Officer Fuentes, the ACPD Officers, and Detective Wanek will be referred to herein collectively as "Appellees."

1

## STATEMENT OF ISSUES

1. Did the District Court err in concluding that the Appellant bore the burden of pleading sufficient facts to state a constitutional claim for purposes of a qualified immunity analysis?

2. Did the District Court err in concluding that the Appellant failed to allege sufficient facts to state a claim against Officer Fuentes?

3. Did the District Court err in concluding that Appellant failed to allege sufficient facts to state a claim against the ACPD Officers?

4. Did the District Court err in concluding that Appellant failed to allege sufficient facts to state a claim against Detective Wanek?

5. Did the District Court err in concluding that the Appellees have qualified immunity from Appellant's claims under the Second Amendment?

## STATEMENT OF THE CASE

### A.    The ACPD Officers respond to a call for assistance.

On February 9, 2020, Appellant was seated in a car parked adjacent to Arlington National Cemetery. JA10-11 ¶ 1, JA14 ¶ 17 n.1, JA16 ¶ 35. Appellee Military Police Officer Michael Armstrong ("Armstrong"), who was assigned to Joint Base Myer-Henderson Hall ("JBM-HH"), allegedly parked a police cruiser behind Appellant's car, preventing him from leaving. JA12 ¶ 10, JA16 ¶ 35. Armstrong then called for assistance from the ACPD. JA17 ¶ 40.

ACPD Officer Javier Fuentes ("Officer Fuentes") responded to Armstrong's call pursuant to Virginia Code § 15.2-1728 and a Memorandum of Understanding between JBM-HH and the County Board of Arlington County. JA256.

Officer Fuentes approached Appellant and asked him to step out of the car he was driving. JA19 ¶ 50, JA153, JA165. Officer Fuentes also asked Appellant if he possessed any firearms. JA19 ¶ 50. Appellant apparently acknowledged having guns, including a Glock handgun and AR-15 rifle, of which Officer Fuentes and the ACPD Officers took possession for the duration of the stop. JA19 ¶ 52. Appellant was then placed in handcuffs while the officers conducted their investigation. JA19 ¶ 49.

At the conclusion of Officer Fuentes's investigation, he cited Appellant because his car bore a fictitious, cancelled, revoked, or otherwise improper registration, a class two misdemeanor in violation of Va. Code § 46.2-612. JA67. Officer Fuentes also cited Appellant for operating his vehicle while not in possession of his Virginia driver's license, in violation of Va. Code § 46.2-104.[4] JA68.

### B.     The ACPD Officers had to tow the car from the scene.

Because the car bore a revoked or fictitious registration, it could not be lawfully driven or parked on the streets of the Commonwealth or Arlington County. *See* Va.

---

[4] Appellant told the officers that he had a Virginia driver's license, but it was not in his possession. JAII 4:47:50. Both Armstrong and Officer Fuentes observed Appellant in the driver's seat of the vehicle, such that he could be presumed to have operated the car for purposes of Virginia law. *See*, *e.g.*, *Nunez v. Commonwealth*, No. 8-21-4, 2022 WL 2203050 (Va. App. June 21, 2022).

3

Code § 46.2-612(B)(1); Arlington County, Va. Code § 14.2-2(A)(2). Accordingly, the car had to be towed from the scene.

ACPD personnel repeatedly discussed these circumstances with Appellant. For example, Officer Soules asked Appellant if he had any friends in the area who could come to pick him up because officers had to tow his car. JAII 4:38:35. Ten minutes later, an unidentified male ACPD officer approached Appellant to tell him that his vehicle had to be towed. JAII 4:48:12. That officer asked Appellant, "Do you know what's happening?" *Id.* Appellant responded "Well, it's got to be towed, and I've got to figure out what's going on with the weapons." *Id.* Appellant then asked, "Can I, like, buy you dinner? Is there anything I can do to not get towed?" *Id.* The officer responded, "No, man, unfortunately I have to tow it. It's beyond that at this point." *Id.* Fourteen minutes later, an officer approached Appellant again to explain that he had to give a sheet of paper to the tow driver. JAII 5:02:00. Officer Soules then explained that Appellant would receive a card with the address of where the car was being towed. JAII 5:02:30.

Approximately thirteen minutes later, and about thirty-seven minutes after first being told that his car had to be towed and an inventory search, discussed *infra*, completed, Appellant asked, "I'm thinking what if I could pay the tow and impound—just pay for it—and they wouldn't have to actually bring it there, and they could just tow it to my property and just pay the additional fee?" JAII 5:15:29. A male officer responded, "Because we called it [the tow], they have to take it to their lot. […] Now

4

you can pay them and have them take you home afterward. You can go there and be like, 'Hey, do you mind just taking it to my house. I'll pay you for it.' That'd be between you guys." *Id.*

Appellant acknowledged to the officers that he understood the process they were following. He stated, "This is the one time I've been in any sort of law enforcement situation where it makes sense. It's clear. Why can't it always be this smooth? This is how it should be." JAII 4:50:15.

### C.    ACPD Officers conducted an inventory search.

Because the car had to be towed, the ACPD Officers completed an inventory search. In addition to the AR-15 rifle and Glock handgun, officers located items including five fully loaded magazines for the AR-15 (constituting 150 rounds of ammunition), U.S. Army patches, a crowbar, two face masks, two vests with bullet proof armor, a smoke grenade, a Texas license plate, two walkie talkies, and a handwritten list of weapons and equipment that Appellant had or needed to purchase. JA266-267. Officers also recovered a medium Ceradyne, Inc. rifle plate with serial number 2923205 (the "rifle plate"), as well as a "handwritten list of chemical compounds that have potential to make the human body bulletproof or even invincible." JA266-267, JA288.

Officers discussed some of the items located in the car with Appellant at the scene. An officer asked Appellant, "You can tell why we're freaked out, right?" JAII 4:59:03. Appellant responded that he "one hundred percent" understood. *Id.* An officer

began to ask Appellant about a paper found in his car with "a bunch of scientific…" JAII 4:59:15. Appellant interrupted by exclaiming, "Don't lose those! That's my stack for nootropics." *Id.* The officer then proceeded to ask about the paper referencing compounds to "make you bulletproof." *Id.* Appellant reacted incredulously, but then declared that he is an "education guy" who prefers that to other activities when he is bored. *Id.* The officer followed up by asking, "I'm bored, so let's make myself bulletproof?" *Id.* Appellant responded, "Fuck yeah." *Id.* Appellant then stated that he believed the officers were misreading the note, explaining that he had done a series of studies on "nootropics" and "ballistics." *Id.*

### D.    ACPD Officers talked to Appellant about his firearms.

Officer Soules told Appellant that, because officers could not simply leave valuables in the vehicle, Appellant could arrange for a friend to come pick up both him and his property, or officers would take it for safekeeping until Appellant retrieved it at his convenience. JAII 4:59:15. Appellant responded by inquiring if those were his only options, asking "I can't skip over that?" JAII 4:39:40. Officer Soules responded, "I would prefer you not to…" *Id.*

ACPD officers discussed with Appellant how they would handle his property— including his firearms—in light of the necessity of towing his car. An officer told Appellant, "You can take all your stuff. We're going to make sure—whatever you don't need and you don't want to, like, take, we'll throw it back in the car so it can go with the car. Whatever you want to take, which will probably be the weapons and

6

whatever else will go with you. Do you have somebody who can pick you up from here?" JAII 4:48:30. Appellant responded that he "would even be for leaving everything in the trunk." JAII 4:48:50. An unidentified officer responded, "I don't know if we can leave the weapons in there, though." *Id.* Officer Soules followed up by stating "Anytime we tow a car, if there's anything—I mean if you had like, the Hope Diamond in there, we couldn't just throw it in the trunk and let them tow it. We'd have to put it in property for safekeeping." *Id.* The unidentified officer then explained, "Yeah, we can take it to our property, exactly like she said, for safekeeping. We give you a paper receipt, and then whenever you're ready you just go pick it up. Take an ID and that paper receipt. But we'd prefer if somebody picked you up and you can just take whatever you need and be done with it." *Id.*

Appellant was unsuccessful in attempting to contact anyone to give him a ride. JAII 5:20:10. Appellant told the officers he did not want them to have to stay out with him any longer than necessary and that he would "figure it out." *Id.* The officers then provided Appellant a copy of the property retrieval form for his property that would be held in safekeeping. *Id.*; *see also* JA10 ¶ 60.

### E. Appellant was convicted of the traffic offenses.

Appellant was convicted of the two traffic offenses with which he was charged. JA67-68. Appellant did not appeal his convictions. *See Comm. v. Wells*, No. GT20007396-00 (Arlington Gen. Dist. Ct. Feb. 28, 2020).

## F.    Detective Wanek investigated.

On or about February 10, 2020, Detective Wanek opened some of the property that had been placed in ACPD safekeeping following the inventory search. JA10 ¶ 80. Among the items opened was soft body armor, which contained the rifle plate. *Id.* Appellant claims that Detective Wanek stated in his notes from that day that he assumed that Appellant stole the rifle plate from the United States government. *Id.* ¶ 81. Appellant further alleges that Wanek's notes show that he was aware that the rifle plate was removed from service in 2016. *Id.* at ¶ 82.

Detective Wanek's notes dated February 10, 2020 do not so reflect. JA292. Instead, they show that Detective Wanek learned from "Fort Meyr that [Appellant] had been involuntarily separated from U.S. Army service on or about May 3, 2019." *Id*. They further show that Appellee Keith Shepherd of the JBM-HH Police Department informed Detective Wanek that the rifle plate had been delivered to the U.S. Army in 2011 and subsequently transferred to JBM-HH. JA293. Shepherd stated that out-processing military personnel cannot retain rifle plates upon separation from service and that each plate "is valued at $590.00." *Id.* In addition, Detective Wanek learned that JBM-HH law enforcement searched for stolen property reports and found that rifle plates had been stolen from Appellant's unit shortly before his separation. JA292-293. According to Appellant, Shepherd confirmed giving this information to Detective Wanek on February 13, 2020—the day before Detective Wanek petitioned for the warrant—in subsequent testimony. JA10 ¶ 88.

8

Appellant asserts that Detective Wanek withheld his alleged knowledge of the origin, value, and "obviously unserviceable and extremely bad condition" of the rifle plate from both the magistrate in petitioning for a warrant on February 14, 2020 and subsequently from the Commonwealth's Attorney. JA10 ¶ 104.

On February 18, 2020, Appellant met with and was interviewed by Detective Wanek and a federal agent. JA10 ¶ 115. During the course of that interview, Wells admitted in a written statement that he kept the rifle plate despite knowing that it did not belong to him "because [he] didn't want to put in the time and energy to return it." JA71. Detective Wanek's notes reflect that, prior to interviewing Appellant, he observed Appellant by video rehearsing his story about the rifle plate, before he had even been told that he was suspected of stealing the rifle plate. JA295. After receiving this statement from Appellant, Detective Wanek served him with the outstanding warrant. JA10 ¶ 146.

On March 16, 2020, the General District Court conducted a preliminary hearing regarding the charge. *See Commonwealth v. Wells*, No. GC20000810-00 (Arlington Gen. Dist. Ct. 2020); *see also* JA311. The General District Court found that probable cause existed to certify the charge to the grand jury. *Id.* The grand jury issued a true bill on March 30, 2020. *Commonwealth v. Wells*, No. CR20000235-00 (Arlington Cir. Ct. Sept. 29, 2020).

With regard to the evidence presented at the preliminary hearing, Appellant's attorney thoroughly cross-examined Shepherd and Detective Wanek. JA352-413.

9

Among the subjects about which Appellant's attorney questioned Detective Wanek were: (1) the origin of the rifle plate, JA352-356, JA394-398; (2) the value of the rifle plate, JA356-357; and (3) the serviceability or condition of the rifle plate. JA357.

## SUMMARY OF ARGUMENT

When Officer Fuentes and the ACPD Officers responded to a call for assistance from Armstrong on February 9, 2020, they found Appellant—already detained—in the driver's seat of his improperly registered vehicle in a parking spot adjacent to Arlington National Cemetery. Knowing the car could not be lawfully operated in Arlington County, the officers prepared to tow it and conducted an inventory search. In addition to an AR-15 rifle and a Glock handgun that had already been removed from the car, they found five fully loaded magazines for the AR-15 (constituting 150 rounds of ammunition), U.S. Army patches, a crowbar, two face masks, two vests with bullet proof armor, a smoke grenade, a Texas license plate, two walkie talkies, and a handwritten list of weapons and equipment that Appellant had or needed to purchase.

Appellant argues that his Second and Fourth Amendment rights were violated at every turn of this interaction with ACPD officers and detectives. His arguments break down into four primary categories: (1) Did Appellees reasonably rely on information obtained from officers—namely Armstrong and Shepherd—from other jurisdictions; (2) Did the District Court inappropriately resolve factual questions in favor of the officers rather than Appellant; (3) Did Detective Wanek misrepresent or

10

conceal information in order to pursue a prosecution of Appellant; and (4) Did Appellees violate the Second Amendment?

As to the first, the law is clear that officers are entitled to rely on the reasonableness of actions taken by officers prior to their involvement in an incident. That is, an officer can only be civilly liable for conduct about which he knew and could conceivably have controlled. Similarly, officers may reasonably rely on the veracity of information obtained from other officers, unless specific facts are present that should have alerted the officer that the information was questionable. Appellant alleged no such facts here, particularly as to Detective Wanek's reliance on the information obtained from Shepherd.

As to the second, Appellant asserts that there are factual questions related to whether an inventory search was complete and whether he consented to have his property placed in safekeeping. He similarly asserts that there are questions regarding when Detective Wanek became aware of information that was arguably exculpatory related to Appellant's possession of the rifle plate. But the documents on which Appellant relied on the trial court to support his allegations—and to which he never objected in the trial court—do not support Appellant's allegations. The District Court appropriately concluded that, where an exhibit is included as part of the pleadings and it contradicts the allegations in the Second Amended Complaint, the exhibit prevails. As a result, the District Court correctly found that the recording of the February 9, 2020 incident objectively shows that the ACPD Officers reasonably completed an

11

inventory search and Appellant consented to the placement of his property in safekeeping. Similarly, the District Court correctly found that both the allegations and the documents show that Detective Wanek was relying on the information he obtained from Shepherd at the time he petitioned for a warrant for Appellant's arrest, and Appellant alleged no facts demonstrating that reliance was not reasonable.

As to the third, beyond Detective Wanek's reasonable reliance on Shepherd, Appellant's claims correctly fail because probable cause existed for his arrest, as found by the general district court during a contested preliminary hearing on March 16, 2020. Each of the issues Appellant accuses Detective Wanek of withholding or misrepresenting was the subject of cross-examination during the preliminary hearing, and the general district court nonetheless concluded that probable cause existed to certify Appellant's charge to the grand jury.

Finally, contrary to Appellant's assertion, it has not been clearly established that Appellant had the constitutional right under the Second Amendment to openly carry an AR-15 on a public street since 1789. In fact, on the date of this incident, the governing decisions of this Court held that there was no constitutionally guaranteed right to possess a specific firearm. *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017). Notably, this incident occurred more than two years prior to the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111

(2022), the case on which Appellant relies to demonstrate his clearly established constitutional right.

For these reasons, the District Court correctly concluded that Appellant's Second Amended Complaint did not state a claim against Appellees. This Honorable Court should affirm that decision.

## ARGUMENT

I.   **The District Court did not err in concluding that Appellant bore the burden of pleading sufficient facts to state a constitutional claim for purposes of the qualified immunity analysis.**

In dismissing the claims against Appellees, the District Court concluded that each was entitled to qualified immunity. Appellant contends that the District Court applied an incorrect standard because, he argues, the burden of pleading and proving qualified immunity rests with the defending party. Appellant misapplies this Court's approach to the doctrine of qualified immunity.

The Supreme Court's two-prong test governing qualified immunity is a familiar one. The first prong considers whether the alleged facts, viewed in the light most favorable to the plaintiff, make out a violation of a constitutional right. If they do, the second prong considers whether the constitutional right in question was "clearly established" at the time of the defendants' alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). The Court has discretion to determine which prong to address first. *Hunsberger v. Wood*, 570 F.3d 546, 552 (4th Cir. 2009).

13

A clearly established right is not discussed in a generalized fashion, but instead must be defined at a high level of particularity. *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003). The Supreme Court has reiterated that "clearly established law must be 'particularized' to the facts of the case . . . [o]therwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 580 U.S. 73, 79 (2017).

The Supreme Court has further stated that,

> [A] court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted. If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—i.e., if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

*Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017). "[I]n other words, the legal question must be 'beyond debate.'" *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 725 (E.D. Va. 2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).

Contrary to Appellant's strenuous assertions, the Fourth Circuit applies a split burden of proof for the qualified immunity defense. *Stanton v. Elliott*, 25 F.4th 227, 227, 233 (4th Cir. 2022). That is, "[t]he plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Id.*

14

And with good reason. The first "prong" of the qualified immunity inquiry is, in effect, the same as the standard for evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Walker v. Prince George's County, Md.*, 575 F.3d 426, 429 (4th Cir. 2009) (noting that the first prong is evaluated under the standard governing motions pursuant to Federal Rules of Civil Procedure 12(b)(6) or 12(c) on a motion to dismiss or for judgment on the pleadings). Therefore, a plaintiff's alleged facts, as in any other case, must describe some kind of actionable harm. Whether qualified immunity exists or not, if the allegations do not describe a constitutional violation, then a plaintiff fails to state a claim.

It was on the first prong that the District Court found the Second Amended Complaint failed. JA489. The District Court concluded that Appellant's allegations, as amplified by the public record[5] and exhibits fairly incorporated into the Second Amended Complaint, did not describe a constitutional violation. Appellant generally objects that the District Court should not have resolved disputed facts at the motion-to-dismiss stage, but the District Court's conclusion did not rely on the resolution of disputed facts. Instead, the District Court considered the exhibits—to which Appellant did not object—and where those exhibits incontrovertibly contradicted Appellant's

---

[5] In evaluating a motion to dismiss, a court may properly take judicial notice of matters of public record. *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (noting it was proper during Rule 12(b)(6) review to consider "publicly available [statistics] on the official redistricting website of the Virginia Division of Legislative Services").

15

allegations, the District Court concluded that the exhibit prevails. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016) ("When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper.").

Here, particularly in the case of the February 9, 2020 recording contained in Joint Appendix II, Appellant expressly relied on the contents of that recording. He cannot create a factual "dispute" merely by claiming that he would testify that the recording does not mean what it objectively says. The Court properly considered that recording and other documents on which Appellant expressly relied—and to which he did not object—in concluding that Appellant's allegations did not describe a constitutional violation or a state-law tort committed by Appellees.

## II. The District Court did not err in concluding that the Second Amended Complaint did not state a cause of action against Officer Fuentes.

Officer Fuentes responded to Armstrong's call for assistance on February 9, 2020.  In doing so, Fuentes did not violate Appellant's constitutional rights.

### A. Officer Fuentes did not violate the Fourth Amendment by continuing Armstrong's stop.

First, Appellant argues that Officer Fuentes violated the Fourth Amendment by continuing a stop that Armstrong initiated in violation of the Fourth Amendment prior to Officer Fuentes's arrival. But, as the District Court correctly observed, "it is well-

settled that officers in one jurisdiction are 'entitled to rely on the determination of [an officer from] another jurisdiction that there is reasonable suspicion to stop a person." JA486 (quoting *United States v. Avagyan*, 164 F. Supp. 3d 864, 884 (E.D. Va. 2016)).

"[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation of the transmitted information." *United States v. Hensley*, 469 U.S. 221, 231 (1985) (internal quotation omitted). Where officers respond to a call for assistance from another officer or jurisdiction, "'they [are] not required to conduct an independent investigation of the facts to come to their own determination regarding whether probable cause existed. Such a requirement would be unworkable in the environments in which the police operate.'" *Guerrero v. Deane*, 750 F. Supp. 2d 631, 652 (E.D. Va. 2010) (quoting *Ware v. James City County*, 652 F. Supp. 2d 693, 703 (E.D. Va. 2009)). *Accord Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.").

Accordingly, although an initial decision to make an investigatory stop may have lacked the necessary reasonable suspicion, officers who responded to a call for assistance during the course of a stop already in progress are innocent of that

unconstitutional conduct. *See Hensley*, 469 U.S. at 232 (observing that officers who rely in good faith on information received from another officer in making a stop "may have a good-faith defense to any civil suit").

Anticipating, but not directly addressing, this argument, Appellant cites to *O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004), in which the Eleventh Circuit concluded that an officer was not entitled to qualified immunity for knowingly participating in conduct that violated the constitution simply because other officers were also engaged in that conduct. *Id.* at 1210. The Eleventh Circuit emphasized that the officer could be held liable "if [he] knew or should have known that their conduct might result in a violation of the plaintiff's Fourth Amendment rights." *Id.*

Here, in contrast, Officer Fuentes responded to a call from Armstrong for assistance with a stop that was already in progress. Officer Fuentes could not have known what led Armstrong to initiate the stop prior to his arrival, and the law imposed no clearly established imperative on Officer Fuentes to cross-examine Armstrong regarding the adequacy of the circumstances that led to his alleged decision to detain Appellant. Even had Officer Fuentes been so obliged, he could readily ascertain that Appellant's vehicle had no lawful registration and was, therefore, not lawfully on the roads of Arlington County. *See* JA67, JA156; ARLINGTON COUNTY, VA. CODE § 14.2-2(A)(2).

Officer Fuentes, therefore, reasonably relied on the validity of Armstrong's call for assistance and alleged decision to detain Appellant prior to Officer Fuentes's

arrival. Officer Fuentes did not violate Appellant's clearly established Fourth Amendment rights in continuing Armstrong's encounter with Appellant, particularly in light of his readily apparent violation—and ultimate conviction—of Va. Code § 46.2-412. Appellant did not allege facts showing a constitutional violation and Officer Fuentes is entitled to qualified immunity on this basis.

**B.     Appellant's remaining allegations do not state a claim against Officer Fuentes.**

The foundation of Appellant's remaining allegations against Officer Fuentes is unclear. Appellant acknowledges that it was proper for Officer Fuentes to detain him "for safety purposes" while investigating the fraudulent license plate. Dkt. No. 31 at 39. He further acknowledges that the removal of his AR-15 and handgun at the outset of his interaction with Officer Fuentes "can be initially construed as reasonable." Appellant apparently maintains that at some unarticulated point, both of these admittedly lawful actions became unconstitutional.

But, as described *infra*, the ACPD officers lawfully initiated an inventory of Appellant's car because it had to be towed from the scene. Moreover, the Supreme Court has held that officers may detain a subject **for hours** in the course of executing a lawful search. *Muehler v. Mena*, 544 U.S. 93, 100 (2005). The Supreme Court observed that the government's interest in not only detaining, but specifically using handcuffs, is at its maximum when weapons are involved. *Id.* Similarly in *Unus v. Kane*, this Honorable Court concluded that a subject's detention in handcuffs for four

hours did not violate the constitution because the officers had reasonable safety concerns that "outweighed the marginal intrusion" of detaining the plaintiff in handcuffs. *Unus v. Kane*, 565 F.3d 103, 120 (4th Cir. 2009) (quotation omitted).

Here, Officer Fuentes and his colleagues encountered Appellant when he was in possession of an AR-15 rifle and Glock handgun, five fully loaded magazines for the AR-15 (constituting 150 rounds of ammunition), U.S. Army patches, a crowbar, two face masks, two vests with bullet proof armor, a smoke grenade, a Texas license plate, two walkie talkies, and a handwritten list of weapons and equipment that Appellant had or needed to purchase. JA266-267. The safety concerns arising in this context could hardly be overstated. Officer Fuentes did not violate Appellant's constitutional rights in detaining him for approximately one hour on February 9, 2020 while the ACPD Officers completed an inventory.[6]

Appellant similarly argues that Officer Fuentes violated his Second Amendment rights when the AR-15 and the Glock handgun were placed in safekeeping at the conclusion of the inventory. Appellant, however, does not allege that Officer Fuentes had a direct role in the interaction that led to the placement of the firearms in safekeeping. Moreover, as discussed, *infra*, the record of the February 9, 2020 incident reflects that Appellant consented to the placement of his firearms in safekeeping. And, even had Appellant not consented, Appellant's right to openly possess an AR-15 was

---

[6] Appellant does not maintain that Officer Fuentes had a direct role in the completion of the inventory. Dkt. No. 31 at 39; JA165-166.

not clearly established on the date of this incident. *See infra.* Appellant, therefore, does not state a claim under the Second Amendment against Officer Fuentes.

Nor can Appellant rely on the actions of others subsequent to Officer Fuentes's involvement in the incident to state a constitutional claim against him. As this Court has observed, a plaintiff must affirmatively show "that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). "Liability under § 1983 has always been personal in nature." *Arebaugh v. Dalton*, 600 F. Supp. 1345, 1348 (E.D. Va. 1985). "Each defendant is entitled to have his case considered individually." *Id.* (citing *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976)). "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) ("[L]iability is personal, based upon each defendant's own constitutional violations."); *Octave v. Wade*, No. 3:16-CV-00338-JAG, 2017 WL 465467, at *3 (E.D. Va. Feb. 3, 2017) ("[T]he culpability of one government official does not infect his or her colleagues by osmosis.").

Appellant's conclusory assertion, therefore, that Officer Fuentes "set in motion, and [ ] substantially cooperated in" every incident about which Appellant complains between February 9, 2020 and April 16, 2021 does not save his claim. Dkt. 31 at 41. Appellant must allege facts demonstrating Officer Fuentes's knowing participation in any conduct by any other officer that violated the Constitution, allegations Appellant

failed to make. Instead, Appellant's sole allegations against Officer Fuentes are that he: (1) assisted an officer from another jurisdiction with a stop that was already in progress; (2) properly detained Appellant and took temporary possession of his firearms; and (3) cited Appellant for violations of Virginia law, of which Appellant was convicted. The District Court properly concluded that these allegations do not state a constitutional claim against Officer Fuentes.

## III.   The District Court did not err in concluding that the Second Amended Complaint did not state a cause of action against the ACPD Officers.

Similarly to Officer Fuentes, the ACPD Officers each responded to a call for assistance from Armstrong.[7] When it was readily apparent that Appellant could not drive his car from the scene or lawfully leave it parked on the streets of Arlington County, the ACPD Officers prepared to conduct an inventory of the vehicle. Having done so, the officers arranged to retain some of Appellant's property in safekeeping, with Appellant's agreement, when it became clear Appellant would be unable to secure a safe method for transporting that property from the scene. The ACPD Officers did not violate the constitution in taking either action.

---

[7] For this reason, the ACPD Officers incorporate the argument outlined in § II.A. as if fully set out herein.  The ACPD officers could and did rely on Armstrong's assessment of the reasonable suspicion justifying the stop.

**A.    The ACPD Officers reasonably believed they were conducting an inventory search of Appellant's car.**

Citing the Virginia Supreme Court's decision in *Cromartie v. Billings*, 298 Va. 284, 837 S.E.2d 247 (2020), Appellant argues that the ACPD Officers violated the Fourth Amendment by searching the car incident to his "arrest" for traffic-related offenses in the absence of probable cause. But, contrary to Appellant's numerous conclusory allegations and as shown by the audio recording attached as Joint Appendix II, the car was searched not incident to arrest or as part of a criminal investigation, but rather pursuant to an inventory search preceding a valid tow. Because Virginia law and the Arlington County code require that all vehicles driven or parked on public thoroughfares be properly registered, Appellant's car could not be driven from the scene, nor could it have remained parked. *See* Va. Code § 46.2-612(B)(1), ARLINGTON COUNTY, VA. CODE § 14.2-2(A)(2).

An inventory search qualifies as a well-defined exception to the warrant requirement of the Fourth Amendment, as the exception serves to "guard against claims of theft, vandalism, or negligence" by police, as well as to "avert any danger to police or others that may have been posed by the property." *Colorado v. Bertine*, 479 U.S. 367, 373 (1987). Police officers frequently perform inventory searches when they impound vehicles or detain suspects. *See, e.g.*, *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983). Such searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to

23

guard the police from danger." *Bertine*, 479 U.S. at 372. To conduct an inventory search, officers do so "according to standardized criteria," such as a police department policy, *Bertine*, 479 U.S. at 374 n.6, and performed in good faith. *United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007).

In the District Court, Appellant argued two reasons why the search of his car did not qualify as an inventory search. First, Appellant argued that, because the ACPD officers did not remove all of the found property for safekeeping, the search could not qualify as an inventory search. The District Court correctly pointed out that this argument is foreclosed by this Court's precedent. JA487 (citing *United States v. White*, 707 F. App'x 766, 769-70 (4th Cir. 2017)).

Second, Appellant argued that the ACPD Officers conducted the inventory as a ruse—a "pretextual rummaging"—knowing that the car would not be impounded. The District Court concluded that the facts, as established by the video submitted without objection in Joint Appendix II, foreclosed that argument. Over the course of well over half an hour, officers repeatedly explained to Appellant that his vehicle had to be towed pursuant to their departmental inventory policy. JAII 4:38:35; 4:48:12; 5:02:00. Appellant even offered to buy an officer dinner to avoid the tow, which the officer declined. JAII 4:48:12. Finally, after the inventory search was already complete, Appellant asked the officers if he could pay the tow truck to deliver the car directly to his residence rather than the impound lot. JAII 5:15:29. The officers again responded negatively, explaining that because they had called the tow, the car had to be taken to

24

the contractor's impound lot pursuant to policy, but Appellant could make whatever arrangements with the tow company he wished after that time. *Id.*

Appellant now argues that he has sufficiently alleged that the ACPD Officers did not follow policy in conducting the inventory search such that his claim should be allowed to proceed. But, as the District Court concluded, there is no question that, at the time the search was completed, the ACPD Officers reasonably believed they were completing an inventory and tow of an unlawfully parked car. As this Court observed in *United States v. Fort*, 313 Fed. Appx. 665 (4th Cir. 2009) (Table), it is the officer's reasonable understanding of the need for an inventory and tow, and not the ultimate completion of the impound, that governs the validity of the search. In *Fort*, the Court concluded that an inventory search was valid despite the driver's wife appearing on scene and taking possession of the vehicle prior to the tow truck's arrival. The Court emphasized that the decision to tow the vehicle and, therefore, subject it to an inventory search, was made before the plaintiff's wife arrived and spoke to the officers. *Id.* at 667. The court further emphasized the dangerous nature of the items—including an AR-15 machine gun—that were removed from the vehicle in concluding that the decision to conduct an inventory was reasonable. *Id.* at 668.

Accordingly, none of the ACPD Officers knew at the time of the inventory search that the vehicle would ultimately be towed to Appellant's residence, as alleged. In fact, contrary to the allegations, the recording establishes that they continued to

believe that standard inventory procedures would be followed.  In light of the Fourth Circuit's decision in *Fort*, it was not clearly established that they violated Appellant's Fourth Amendment rights in completing the inventory search.  The District Court correctly concluded that they are entitled to qualified immunity.

## B.    The ACPD Officers did not violate the Fourth Amendment in taking possession of the "List."

Appellant argues, at length, that an "unidentified officer" stated that Appellant was in possession of a "handwritten list of chemical compounds that have potential to make the human body bulletproof or invincible." Dkt. No. 31 at 45. According to Appellant, not only the seizure of the list, but the characterization of the list, somehow violated Appellant's constitutional rights.

As an initial matter, and as argued *supra* § II.B., Appellant's contention is insufficient to state a claim against any of the individual ACPD Officers.  Allegations of misconduct must be individualized in order to state a claim under § 1983. *Wright*, 766 F.2d at 850.

Even were this allegation directed to an individual officer, it has no bearing on any of Appellant's claims. Appellant does not explain how the ACPD Officer's alleged misinterpretation of the "list" contributed to any constitutional harm he experienced. The ACPD Officers took possession of the alleged list during an inventory search and placed it in safekeeping. The actual content of the list, rather than a label assigned to it during an inventory search, would govern any future use of or reliance on the list.

And, in fact, the list appears to reference numerous chemical compounds, including "Bulletproof Choline Force," "nootropics," combat veterans, dosing, and potential uses for these compounds. JA288. The ACPD Officers' interpretation of the list was not unreasonable.

Finally, the ACPD Officers did not simply take possession of the list—they asked Appellant what it was, a conversation that was recorded. When asked about the paper referencing compounds to "make you bulletproof," Appellant declared that he is an "education guy" who prefers that to other activities when he is bored. JAII 4:59:03. The officer followed up by asking, "I'm bored, so let's make myself bulletproof?" *Id.* Appellant responded, "Fuck yeah." *Id.* Appellant then stated that he believed the officers were misreading the note, explaining that he had done a series of studies on "nootropics" and "ballistics." *Id.* To the extent, therefore, that Appellant argues the ACPD Officers incorrectly interpreted the "list," they attempted to clear up their understanding of what it was in good faith, and it was Appellant who connected the "list" to ballistics.

### C.    The ACPD Officers did not violate the Second Amendment.

Appellant maintains the District Court erred by resolving "disputed facts" in the ACPD Officers' favor and concluding that he consented to the placement of his property, including his firearms, in safekeeping. According to Appellant, he would testify that he did not consent, such that the District Court should not have concluded otherwise for purposes of evaluating a motion to dismiss. But Appellant cannot create

a dispute of fact merely through allegations when an exhibit, properly incorporated into the Second Amended Complaint, contradicts those claims. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016).

Here, the District Court correctly concluded that the recording shows that Appellant objectively consented to the placement of his firearms in safekeeping. The ACPD Officers gave Appellant options for handling his property given the necessity of towing his vehicle. Appellant could leave with his property—including his firearms—if he obtained a ride from the scene, or he could choose to allow ACPD to place the property in safekeeping until Appellant could retrieve it at his convenience. The ACPD Officers told Appellant, "We'd prefer if somebody picked you up and you can just take whatever you need and be done with it." JAII 4:48:50. Because he was unable—after at least half an hour of trying—to secure a ride, and because the ACPD Officers were concerned about Appellant's walking down a public street under the circumstances with a loaded assault rifle, Appellant ultimately told the officers that he did not want them to stay out with him any longer than necessary and he would "figure it out."[8] *Id.* at 4:50:20. Appellant then signed the property safekeeping form. JA69.

---

[8] Appellant argues that this statement was not consent, in part, because he had asked if he could take an Uber. Dkt. No. 31 at 63. In point of fact, Appellant could not take an Uber with his firearms. *See* Uber Firearms Prohibition Policy, accessible at https://www.uber.com/legal/en/document/?country=united-states&id=ebd579&lang=en&name=firearms-prohibition-policy&uclick_id=52e8fc79-0276-45f1-9602-43ed52c0b6e7 (last accessed December 14, 2023).

The ACPD Officers, therefore, did not violate Appellant's clearly established constitutional rights by placing his property in ACPD's safekeeping.

Moreover, even had the ACPD Officers actions amounted to a governmental seizure of Appellant's firearms, in February 2020 the Supreme Court had not yet held that the Second Amendment to the United States Constitution guaranteed a private right to possess firearms on public streets. Appellant points to *District of Columbia v. Heller*, 554 U.S. 570 (2008) to support his claim. The holding in *Heller*, however, was limited to the private right to possess a handgun in an individual's home. *Heller*, 554 U.S. at 635. Appellant similarly points to *New York State Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111 (2022), which had not—of course—been decided in February 2020. In fact, at the time this incident occurred, controlling precedent in this Circuit held that the Second Amendment did not protect an individual's right to possess any specific type of firearm. *See Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated by Bruen*, 142 S. Ct. 2111 (2022), (concluding that the Second Amendment did not protect an individual's possession of an AR-15 rifle).

This Honorable Court does not appear to have addressed the Second Amendment implications of a seizure of firearms by the police during a stop or arrest. The Seventh Circuit's approach in *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir. 2014) is instructive. The court observed that "Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and

29

limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention." *Id.* at 571. The court further noted that the seizure of a particular firearm is more properly considered as a question of due process, rather than the Second Amendment. *Id.* at 571-572. "[T]he seizure of a particular firearm did not otherwise interfere with this Second Amendment interests… The defendants did not prohibit [the subject] from retaining or acquiring other firearms." *Id.* (discussing *Walters v. Wolf*, 660 F.3d 307, 317-18 (8th Cir. 2011)). An argument that the Second Amendment prohibits the seizure of a particular firearm "implicates not only the individual's right to possess a firearm, but the ability of the police to take appropriate action when they are confronted with a firearm that *may or may not* be lawfully possessed, and which, irrespective of the owner's right to possess the firearm, may pose a danger to the owner or others." *Id.* at 572.

Accordingly, Appellant's allegations regarding the seizure of the two firearms from the car does not articulate a clearly established violation of the Second Amendment. For this reason, the District Court correctly concluded that Officers Fuentes and the ACPD Officers are entitled to qualified immunity.

## IV. The District Court did not err in concluding that the Second Amended Complaint did not state a cause of action against Detective Wanek.

Although Appellant's claims against Detective Wanek arise from different factual circumstances, the same legal principles that undermined his claims against the

ACPD Officers are fatal to those against Detective Wanek. Moreover, the fact that Appellant received a contested preliminary hearing, at which all of the issues about which Appellant now complains were discussed and the judge nonetheless found probable cause to certify the charge to the grand jury, demonstrates that Detective Wanek's belief that probable cause existed was reasonable as a matter of law. The District Court, therefore, did not err in concluding that Detective Wanek was entitled to qualified immunity.

### A.   Detective Wanek reasonably relied on information he received from Shepherd.

Appellant first argues that Detective Wanek violated the Fourth Amendment by continuing the unlawful seizure of Appellant's property that began on February 9, 2020. Dkt. No. 31 at 46. But, as outlined above, Appellant's property was not unlawfully seized. His property, specifically the rifle plate that became the subject of Appellant's criminal charge, was placed in safekeeping following a lawful inventory search. Similarly, the firearms were placed there with Appellant's consent. And, as Appellant now concedes, once lawfully in police custody, the materials could be lawfully reviewed by officers without violating the Fourth Amendment. Dkt. No. 31 at 46; *see also United States v. Davis*, 690 F.3d 226, 254 n.30 (4th Cir. 2012).

Even if Appellant's property was unlawfully seized, however, Appellant cannot state a constitutional claim against Detective Wanek for that seizure. Detective Wanek had no knowledge of or involvement in the incident on February 9, 2020, and relied

in good faith on the actions of his fellow officers. *See Hensley*, 469 U.S. at 232 (Officers who rely in good faith on information received from another officer "may have a good-faith defense to any civil suit.").

Appellant next maintains that Detective Wanek violated the Fourth Amendment by knowingly making false statements to the magistrate to obtain warrants for Appellant's arrest. To state a Fourth Amendment malicious prosecution claim, a plaintiff must show "that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). The causation element requires a showing of "both but-for and proximate causation," and "subsequent acts of independent decision-makers (e.g., prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." *Id.*

Here, Appellant asserts that Wanek made false statements regarding the value of the rifle plate and whether Wells could conceivably have stolen the rifle plate before being involuntarily separated from the military. As the District Court correctly found, Appellant's allegations and the incorporated documents show that Detective Wanek relied on Shepherd for the accuracy of his information. JA292-293, JA494-495. Notably, Shepherd told Detective Wanek on February 13, 2020, the day before he petitioned for the warrant, that the rifle plate had moved through Fort Myer and that the value was $590. JA26 ¶ 88, JA293. Appellant did not allege, and does not argue

now, that Detective Wanek was aware of any information that would have caused a reasonable investigator to question the information Shepherd provided him on February 13, 2020. *See Mom's Inc. v. Willman*, 109 Fed. Appx. 629, 636 (4th Cir. 2004).

**B.    The general district court found probable cause to certify Appellant's criminal charge following a contested preliminary hearing.**

Like most criminal cases in Virginia, Appellant's charge—for which Detective Wanek petitioned for a warrant on February 14, 2020—received three probable cause determinations before it was certified to the Circuit Court.[9] Most notable of these determinations is the preliminary hearing held on March 16, 2020. JA311. At that hearing, Appellant's criminal attorney cross-examined both Detective Wanek and Shepherd about all the issues about which Appellant now accuses Detective Wanek of lying in this case.

For example, Appellant accuses Detective Wanek of lying about his knowledge of the origin of the rifle plate, and how it came to be in Appellant's possession. Appellant's attorney specifically asked Detective Wanek and Shepherd how the rifle plate had been traced during the preliminary hearing. Shepherd, on whom Detective Wanek relied for his information, testified that he could not confirm conclusively that

---

[9] Va. Code §§ 19.2-72 (warrants may issue pursuant to probable cause); 19.2-183, *et seq.* (providing for preliminary hearing); 19.2-191 (grand juries return true bills of indictment upon a finding of probable cause).

33

the rifle plate ever came to Fort Myer. JA353. Notably, Shepherd also confirmed having told Detective Wanek that he believed it had.

Similarly, Appellant argues Detective Wanek lied about the value and serviceability of the rifle plate. A photo of the rifle plate was admitted into evidence, however, during the preliminary hearing. JA320. Moreover, Appellant's criminal attorney specifically asked Shepherd about the value of the plate and its serviceability or condition.[10] JA356-357. There is no wonder that Appellant's attorney asked Shepherd about this information rather than Detective Wanek because Shepherd was the ultimate source of Detective Wanek's information.

The issues, therefore, about which Detective Wanek allegedly lied to the magistrate—including his interview with witness Dotson, JA404—was unquestionably presented to the general district judge during a contested preliminary hearing. At the conclusion of that hearing, the general district judge nonetheless found

---

[10] Even were Shepherd mistaken about the value of the rifle plate, that would only have reduced the charge from a felony to a misdemeanor for purposes of Virginia law. *See* Va. Code §§ 18.2-95, 96. It would not have undermined the existence of probable cause entirely. Nor is the law surrounding the valuation of property for purposes of Virginia's larceny statutes as clear as Appellant intimates. Replacement value is not irrelevant to the value determination, but rather one of several factors a court may consider to determine the actual value of a stolen item, particularly in the context of items that are not generally available on the standard public market, such as military equipment acquired for use by the United States Army. *See, e.g.*, *Baylor v. Commonwealth*, 55 Va. App. 82, 90, 683 S.E.2d 843, 846-47 (2009). Here, the process the Army would have to go through to replace a stolen rifle plate is certainly relevant to the question of value to the victim of the alleged crime, and a matter to be fully developed through a criminal trial. Detective Wanek's use of that value for purposes of a probable cause determination was, therefore, reasonable, and did not amount to a misrepresentation that could violate the constitution.

probable cause to certify the charge to the grand jury. JA430. The general district judge

based his conclusion, in part, on Appellant's statement to Detective Wanek, which he

does not challenge here, acknowledging his possession of the rifle plate, despite

knowing it did not belong to him and should be returned to the Army.[11] JA71, JA427-

428.

Accordingly, not only the magistrate and the grand jury, but also the finding of

probable cause at the preliminary hearing was an intervening and superseding cause

of the criminal charge against Appellant. *Evans v. Chalmers*, 703 F.3d 636, 647 (4th

Cir. 2012). It is, furthermore, proof that Detective Wanek reasonably believed

probable cause existed and is entitled to qualified immunity.

## V.     The District Court did not err in dismissing the state-law claims.

Appellant did not address the state claims for false imprisonment or malicious

prosecution in his brief, and thus those claims are deemed abandoned. See FRAP R.

---

[11] Appellant was charged with violating Va. Code § 18.2-108, which states, "If any person buys or receives from another person, or aids in concealing, any stolen goods or other thing, knowing the same to have been stolen, he shall be deemed guilty of larceny thereof, and may be proceeded against, although the principal offender is not convicted." Appellant's knowing possession of the rifle plate, when combined with his statement acknowledging that it did not belong to him and should have been returned to the Army, satisfied the threshold to find probable cause for a charge of receiving stolen property as a matter of Virginia law. *See Shaver v. Commonwealth*, 30 Va. App. 789, 520 S.E.2d 393 (Va. App. 1999) ("To convict a defendant under Code § 18.2-108, the Commonwealth must prove that property was (1) previously stolen by another, and (2) received by defendant, (3) with knowledge of the theft, and (4) a dishonest intent.") (quotation omitted). Detective Wanek, therefore, reasonably believed probable cause existed to support the charge against Appellant.

28 (a)(6); *see also Cades v. H & R Block, Inc.*, 43 F.3d 869, 876 (4th Cir. 1994). Even

so, these claims would fail for many of the same reasons argued above.

"To prevail in an action for false imprisonment, a plaintiff must prove that [his]

liberty was restrained, either by words or acts that [he] would fear to disregard, and

that there was no sufficient legal excuse to justify the restraint." *Dill v. Kroger Limited*

*Partnership I*, 300 Va. 99, 114, 860 S.E. 2d 372, 380 (2021). "However, in no case

may a person prevail on a claim of false imprisonment if [his] arrest was lawful." *Id.*

at 114, 381. The ACPD Officers only detained Appellant for the time necessary to

fully investigate the charges related to his improper registration and driver's license

and to process his vehicle, which could not be lawfully driven away from the

scene. Detaining Appellant at the scene for this brief period of time was, therefore,

legally justified and cannot constitution false imprisonment under Virginia law. In

addition, the officers quickly became aware that Appellant was heavily armed, with

both firearms and knives and, therefore, their decision to detain Appellant in handcuffs

during the course of a lawful investigation did not amount to false imprisonment.

Appellant's malicious prosecution would likewise fail. "In an action for

malicious prosecution, the plaintiff must prove four elements: that the prosecution was

(1) malicious; (2) instituted by or with the cooperation of the defendant; (3) without

probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Lewis*

*v. Kai*, 281 Va. 715, 722, 708 S.E.2d 884, 889 (2011). Because Appellant was

convicted for violating Va. Code §§ 46.2-104 and 612, Appellant cannot show the

prosecutions on those charges were without probable cause or determined in his favor. In addition, the finding of probable cause at the preliminary hearing was a superseding cause that shields Detective Wanek from any alleged liability. *See Evans,* 703 F.3d at 647. It also demonstrates that Detective Wanek reasonably believed probable cause existed to charge Appellant with a crime as a matter of law.

## CONCLUSION

For the reasons stated above, this Court should affirm the District Court's Order granting the Motions to Dismiss filed by Officer Fuentes, the ACPD Officers, and Detective Wanek.

**JAVIER FUENTES, SCOTT WANEK, LAUREN LUGASI, KIMBERLY SOULES, AUSTIN KLINE AND JOHN VANAK**

*s/ David P. Corrigan*
David P. Corrigan (VSB No. 26341)
Leslie A. Winneberger (VSB No. 45040)
Blaire H. O'Brien (VSB No. 83961)
HARMAN CLAYTOR CORRIGAN WELLMAN
Post Office Box 70280
Richmond, Virginia 23255
(804) 747-5200 (Telephone)
(804) 747-6085 (Facsimile)
dcorrigan@hccw.com
lwinneberger@ hccw.com
bobrien@hccw.com

**CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,444 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements to Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced Times New Roman font size 14.

Dated: December 15, 2023

/s/ Leslie A. Winneberger
Leslie A. Winneberger
***Co-counsel for Appellees***